## ADAMS OUTDOOR ADVERTISING

### V.

## CITY OF NEWPORT NEWS, ET AL.

Record No. 880126

November 18, 1988

Present: Carrico, C.J., Compton, Stephenson, Russell, and Thomas, JJ., and Gordon and Harman, Retired Justices

372

*Hunter W. Sims, Jr. (Stephen E. Noona; Kaufman & Canoles, P.C., on briefs), for appellant.*

*Leonard A. Wallin, II, Assistant City Attorney (Verbena M. Askew, City Attorney, on brief), for appelles.*

STEPHENSON, J., delivered the opinion of the Court.

The dispositive issue in this appeal is whether an ordinance adopted by the City of Newport News, regulating certain billboards, Chapter 13, Article XV, §§ 13-335 through -344 of the Newport News City Code (the ordinance), unlawfully abridges freedom of speech in violation of the First Amendment to the United States Constitution[1] and Article I, § 12 of the Constitution of Virginia.[2]

Adams Outdoor Advertising (Adams) instituted a declaratory judgment proceeding against the City of Newport News and Charles Alexander, Zoning Administrator (collectively, the City), seeking an adjudication that the ordinance is unconstitutional on its face and as applied. Adams also requested that the trial court enjoin enforcement of the ordinance. Adams claimed that the ordinance is unconstitutional because it abridges freedom of speech, constitutes an unlawful exercise of police power, impairs vested

---

[1] The First Amendment provides in pertinent part:
   Congress shall make no law . . . abridging the freedom of speech, or of the press . . . .

[2] Article I, § 12, provides in pertinent part:
   That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press . . . .

rights, and constitutes a taking of and damage to private property for public uses without just compensation.[3]

The trial court rejected all Adams' claims, ruled that the ordinance is constitutional, denied Adams any relief, and entered judgment for the City. Adams appeals.

## I

The ordinance in pertinent part provides as follows:

### Sec. 13-335. Findings.

It is hereby determined that the number of signs in the city is excessive and unduly distracting to motorists and pedestrians, creates a traffic hazard, and in some places reduces the effectiveness of signs needed to direct the public. It is also determined that the appearance of the city is marred by the excessive number of signs. It is also determined that the number of distracting signs needs to be reduced in order to minimize the aforementioned effects, and that signs of least importance in occupying limited public views to people within the city are those which convey commercial messages other than the advertisement of any product, service, event, person, institution or business located on the premises where the sign is located, or for the sale or rental of such premises. It is also determined that the regulations contained in this Code are the minimum amount of regulation necessary to achieve its purpose.

### Sec. 13-336. Definitions.

. . . .

*Off-Premises Sign:* A sign structure advertising an establishment, merchandise, service or entertainment, which is not sold, produced, manufactured or furnished at the property on which said sign is located.

*On-Premises Sign:* A sign which pertains to the use of the property on which it is located.

---

[3] Because our decision pertaining to Adams' freedom of speech contention is dispositive, we do not address the other issues.

. . . .

*Sign:* Any structure, wall or other object used for the display of any message, including but not limited to any device, structure, fixture or placard using graphics, symbols and/or written copy designed specifically for the purpose of advertising or identifying any establishment, product, goods or services.

. . . .

**Sec. 13-338. Exempted signs.**

The following signs shall be exempted from the provisions of this article but not the building regulations as contained in this Code, when determined not to be detrimental to the health, safety, and welfare of the public:

(a) Activity signs denoting the revivals or other normal functions of bona fide religious or nonprofit organizations when such signs are:
  (1) Located on the site of such organization or activity.
  (2) Limited to one (1) sign of not more than thirty-two (32) square feet per lot.

(b) Bulletin boards not exceeding twelve (12) square feet for a church or other place of worship or for a public building, when located on the same premises as the building to which they refer.

(c) Construction signs shall be limited to a maximum area of thirty-two (32) square feet and removed at the completion of said development or construction.

(d) Menu boards which are either freestanding or affixed wall signs designed as an outdoor means to communicate orders for food and beverages contained within the business structure itself, which are not legible from any public right-of-way and which provide on-site information for drive-in service and not additional advertisement; provided that they do not exceed sixteen (16)

square feet when located in a front yard or a side yard and twenty-four (24) square feet when located in a rear yard; provided further that there be no more than one (1) menu board per lot.

(e) Noncommercial signs necessary to denoting information pertaining to direction, safety and messages required by law such as building numbers or identification or traffic controls which shall not be measured against permitted sign area. Directional signs of two (2) square feet or less of sign area will not be included in computation of accumulative sign area. Directional signs over two (2) square feet will be computed in the accumulative sign area.

(f) Political signs located on sites which are used for campaign headquarters for political campaigns. All political signs shall be removed within ten (10) days from the date of the election. Upon written application to and approval by the zoning administrator, the period for removal may be extended, for good cause shown, for an additional ten-day period only.

(g) Professional nameplates when attached to buildings and not exceeding two (2) square feet in area.

(h) Public, institutional or religious building identification signs.

(i) Real estate signs advertising the sale or rental of the premises upon which such sign is located provided such signs are limited to an accumulative area of six (6) square feet for residential properties and for commercial and industrial properties having a frontage of less than one hundred (100) square feet; and sixteen (16) square feet for commercial and industrial properties having a frontage of one hundred (100) feet or more. Not more than two (2) such signs shall be located on any one (1) lot.

(j) Real estate open house signs in public rights-of-way located in residential zoning districts only, directing the public to residential units for sale provided:

(1) Such signs do not exceed three (3) square feet in area or be over three (3) feet in height and provided they are displayed in the following manner:

a. No sign may be placed in the median or on an area paved for vehicular or pedestrian traffic.

b. The sign is located only at intersections where a turning movement is indicated.

c. There may be no more than two (2) signs at any one (1) intersection.

d. Express permission has been obtained from all adjacent property owners.

e. The sign shall be located off the roadway so as not to endanger, impede the flow or interfere with the view of vehicular or pedestrian traffic and shall not be displayed when the house is not open for public viewing.

f. The sign shall only be displayed on Saturdays, Sundays and state and federally observed holidays from sunup to sundown.

g. Copy shall be limited to "Open House" with directional arrow, and a maximum of one (1) square foot to identify the owner of the sign.

(2) Signs displayed in violation of the provisions of this section shall be confiscated by the city.

(3) Persons causing open house signs to be placed on city right-of-way shall provide the city with evidence of a five hundred thousand dollars ($500,000.00) general liability insurance policy with the city named as an additional insured before display of signs may be permitted.

(k) Residential subdivision development signs when erected permanently as markers at the entrance to such residential development and denoting the name of the residential development only.

(l) Special event signs when in the public interest and not hazardous to private property. Such signs shall be displayed no more than thirty (30) days prior to the special event and removed within ten (10) days following the event. Such signs shall be limited to the following events:

(1) Special civic or cultural event such as a fair or exposition, play, concert or other bona fide activity or meeting by a government, charitable or nonprofit organization.

(2) Special decorative displays used for national holidays, public demonstrations or promotion for non-partisan civic purposes.

(3) Special decorative displays used for purposes of announcing the grand opening or reopening of a new store, business or profession.

(m) Traffic or all other municipal signs, including but not limited to legal notices, railroad crossing signs and temporary emergency signs.

(n) Urban signs addressed by the Newport Centre Urban Design Plan:

(1) Business/office directories which are either free-standing or affixed wall signs and when used in a nonadvertising display to offer information to the pedestrian public and their size is limited to twelve (12) square feet or less.

(2) Projecting signs when located in the DBCW sector and not exceeding two (2) square feet in area.

**Sec. 13-339. Prohibited signs.**

The following signs shall be prohibited within the city:

. . . .

(e) Off-premises signs shall be prohibited with the exceptions set forth below:

(1) Off-premises signs existing as of the adoption of this article [August 14, 1984] and erected pursu-

ant to section 33.1-370 of the Code of Virginia (pertaining to outdoor displays along interstate and federal-aid highways) shall be permitted to remain.

(2) New off-premises signs shall be permitted along Interstate 64 and Interstate 664 only and under these following conditions:

a. Permitted only if the statutory provisions of the Code of Virginia 1950 (as amended), title 33.1, chapter 7, "Outdoor Advertising in Sight of Public Highways," are met.

b. Permitted on undeveloped properties only and must be removed when the property is developed.

c. Spaced no less than one thousand (1,000) feet apart.

d. Not located closer than five hundred (500) feet to the edge of an interchange.

e. Not located closer than seven hundred fifty (750) feet to any residential district.

. . . .

### Sec. 13-340. Removal of signs.

Ninety (90) days after this article takes effect, it shall be a violation hereof to maintain any prohibited sign except for section 13-339(e) and 13-339(f), "Prohibited Signs." One hundred eighty (180) days after this article takes effect, it shall be a violation hereof to maintain any section 13-339(e) prohibited sign. After June 30, 1985, it shall be a violation hereof to maintain any section 13-339(f) prohibited sign except as provided therein.

The zoning administrator may cause the removal of an illegal sign in cases of emergency, or for failure to comply with the written orders of removal or repair. After removal or demolition of the sign, a notice shall be mailed to the sign owner stating the nature of the work and the date on which it was performed and demanding payment of the costs.

If the amount specified in the notice is not paid within thirty (30) days of the notice, it shall become a lien against the property of the sign owner, and will be certified as such against the property.

The owner of the property upon which the sign is located shall be presumed to be the owner of all signs thereon unless facts to the contrary are brought to the attention of the zoning administrator, as in the case of a leased sign.

For purposes of removal, the definition of sign shall include all sign embellishments and structures designed specifically to support the sign. This section shall not apply to signs erected in conformance with all other provisions of the city pertaining to signs.

## II

The facts essentially are undisputed. Adams owns 38 billboards located in the City. The billboards have a total of 53 poster panels on which advertising may be displayed. All billboards are outdoor permanent structures, affixed to the ground by steel supports buried five to eight feet in subterranean concrete foundations. Generally, each billboard is 12 feet by 25 feet in size. Each has a market value of between $6,000 and $24,000, with a remaining useful life in excess of five years.

Each billboard is located on private property, and all but one are located on property leased by Adams. The parties stipulated that "the billboards are classified as off-premise[s] as opposed to on-premise[s] signs because the advertising thereon does not pertain to the use being made of the property on which they are located."

Adams displays both commercial and noncommercial messages on its billboards. Examples of noncommercial messages include advertisements for the Red Cross Blood Bank, Mothers Against Drunk Drivers, the Statue of Liberty Fund, the United States Food Stamp Program, various political and public interest campaigns, and assorted national public service organizations. Adams charges for commercial and some noncommercial displays, although Adams donates much of the noncommercial space. The use of billboards for noncommercial advertising is essential be-

cause alternative media channels are prohibitively expensive and less likely to reach the targeted general public audience.

None of Adams' billboards is located in a public right-of-way, and none blocks a traffic sign or the view of an intersection from a roadway. Illuminated billboards have lighting directed at the billboard's message, which is designed to be read within one or two seconds. Adams maintains all its billboards in a sound structural fashion, has never received any notice or indication that these billboards have been the cause of any accident or traffic safety problem, and has always restricted their use to lawful, non-misleading, and tasteful messages.

With one exception, all billboards were constructed prior to the ordinance's enactment, and the permit for the one exception was obtained before the ordinance was passed. Before each billboard was constructed, Adams obtained the appropriate permits from the City and complied with all applicable rules and regulations. With the exception of the ordinance in issue, all Adams' billboards were erected and have been continuously maintained in conformity with all applicable laws and regulations.

In June 1984, City Council began consideration of a revised ordinance to govern and regulate the use of outdoor advertising signs. Previously, a sign ordinance subcommittee of the City Planning Commission and the Planning Commission itself had studied revision of the City's sign ordinance. City Council members did not attend or participate in any of the study sessions.

On June 4, 1984, City Council held its first session to consider the proposed new sign ordinance. No minutes were kept for that work session, but each member of City Council was provided a copy of a 48-page booklet entitled, "City of Newport News Proposed Sign Regulations."

On July 9, 1984, City Council conducted a public hearing on the proposed new sign ordinance. At that time, interested citizens were allowed to present their views. On August 14, 1984, City Council, by unanimous vote, enacted Ordinance 3213-84, Newport News City Code §§ 13-335 through -344, to regulate outdoor advertising signs in the City and to provide for the removal of outdoor advertising signs that do not comply with the ordinance.

Following passage of the ordinance, the City's Zoning Administrator notified the owners of the land on which Adams' billboards are located that the billboards had to be removed, except those falling within the scope of Section 33.1-370, Code of Virginia,

which regulates signs adjacent to interstate and federal-aid primary highways. Although the removal of the billboards will substantially diminish their value and cause Adams to incur substantial expenses, the City has refused to pay any compensation for the resulting damage and expense. The 180-day removal period specified in the ordinance was intended to give owners ample time to remove their billboards and was not intended to be an amortization period.

## III

Two conflicting rights are involved in this appeal: (1) the right to free, individual self-expression, and (2) a government's right to enact legislation for the safety and welfare of its citizens. This conflict has troubled local governments since the Supreme Court ruled in *Gitlow* v. *New York*, 268 U.S. 652, 666 (1925), that the First Amendment's free speech clause applied to the states.

■ To safeguard free speech, the Supreme Court requires that a regulatory measure be content neutral. The doctrine of content neutrality provides that governmental regulations may not "restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chicago* v. *Mosley*, 408 U.S. 92, 95 (1972).

■ The doctrine of content neutrality, however, does not preclude all governmental regulation that restricts expression. Restrictions on the time, place, and manner of expressions are permissible if "they are justified without reference to the content of the regulated speech, . . . serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U.S. 748, 771 (1976).

■ When, however, governmental regulation is based upon the content of speech, as opposed to a time, place, and manner classification, the regulation must be strictly scrutinized, *see Consol. Edison Co.* v. *Public Service Comm'n*, 447 U.S. 530 (1980), because regulation that relates to subject matter " 'slip[s] from the neutrality of time, place, and circumstance into a concern about content,' " *Mosley*, 408 U.S. at 99, *quoting* Kalven, *The Concept of the Public Forum: Cox v. Louisiana*, 1965 Sup. Ct. Rev. 1, 29. Under the strict scrutiny test, a regulation on protected speech will withstand a First Amendment challenge only if a government shows that (1) it has a compelling interest in re-

stricting speech, (2) the restrictions further such an interest, and (3) a more narrowly drawn restriction will frustrate its interest. *Consol. Edison Co.*, 447 U.S. at 540.

In short, the time, place, and manner rule reflects the judicial conclusion that First Amendment rights should yield to legitimate local regulations when the restriction on protected speech is merely incidental. The stricter test, on the other hand, reflects the belief that governmental regulations should not be employed to restrict unduly or prohibit protected speech.

The two broad categories of protected speech pertinent to this appeal are commercial speech and noncommercial communications. When the Supreme Court initially considered a First Amendment challenge to commercial speech in *Valentine* v. *Chrestensen*, 316 U.S. 52 (1942), it held that purely commercial advertising was not entitled to First Amendment protection, *id*. at 54. In *Virginia Pharmacy*, however, the Supreme Court concluded that commercial speech is not "wholly outside the protection of the First Amendment," 425 U.S. at 761, and held that a Virginia statute banning the advertising of prescription drug prices by pharmacists was unconstitutional.

In *Virginia Pharmacy*, the Court determined that the time, place, and manner test was inappropriate because the challenged Virginia statute "singles out speech of a particular content and seeks to prevent its dissemination completely." *Id*. at 771. The Court, instead, applied the stricter test and invalidated the statute, concluding that Virginia had not shown that the statute was narrowly drawn to serve a compelling interest. *Id*. at 773. *Accord Linmark Assoc., Inc.* v. *Township of Willingboro*, 431 U.S. 85 (1977) (ordinance prohibiting posting real estate "For Sale" or "Sold" signs unconstitutional; stricter test applied, rather than time, place, and manner, because proscription based on content).

Following *Virginia Pharmacy* and *Linmark*, however, the Supreme Court, in *Central Hudson Gas* v. *Public Service Comm'n of N. Y.*, 447 U.S. 557 (1980), relaxed the standard of review applicable to commercial speech, concluding that "[t]he Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interest served by its regulation." *Id*. at 562-63 (citation omitted).

■ Consequently, the Court adopted a third, intermediate test for determining whether a governmental restriction on commercial speech is violative of the First Amendment: If the regulated commercial speech concerns a lawful activity and is not misleading, then the restriction is valid if it (1) seeks to advance a substantial governmental interest, (2) directly advances the asserted interest, and (3) reaches no further than necessary to accomplish that interest. *Id.* at 566.

In *Metromedia, Inc.* v. *City of San Diego*, 453 U.S. 490 (1981), the Court considered "the validity of [a city] ordinance . . . imposing substantial prohibitions on the erection of outdoor advertising displays." *Id.* at 493. Stating that its purpose was " 'to eliminate hazards to pedestrians and motorists brought about by distracting sign displays,' " and " 'to preserve and improve the appearance of the City,' " the City of San Diego adopted an ordinance prohibiting " 'outdoor advertising display signs.' " *Id.* " 'Advertising display signs' " were defined as any sign that " 'directs attention to a product, service or activity, event, person, institution or business.' " *Id.* The ordinance provided for two exceptions: (1) onsite signs, and (2) signs within 12 specified categories. San Diego's ordinance defined onsite signs as those

designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed.

*Id.* at 494 n.1.

The 12 categories specifically exempted from the prohibition included:

government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, if not used for advertising purposes; commemorative historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision directional signs; and "[t]emporary political campaign signs."

*Id.* at 494-95. Thus, San Diego's ordinance permitted onsite commercial advertising but everywhere prohibited other commercial and noncommercial communications that used fixed-structure signs, unless they were permitted by one of the 12 categories specifically excepted. *Id.* at 495-96.

The appellants in *Metromedia* were companies engaged in the outdoor advertising business in San Diego. "Although the purchasers of advertising space on appellants' signs usually [sought] to convey a commercial message, [appellants'] billboards [had] also been used to convey a broad range of noncommercial political and social messages." *Id.* at 496.

In *Metromedia*, the parties stipulated that

[o]utdoor advertising increases the sales of products and produces numerous direct and indirect benefits to the public. Valuable commercial, political and social information is communicated to the public through the use of outdoor advertising. Many businesses and politicians and other persons rely upon outdoor advertising because other forms of advertising are insufficient, inappropriate and prohibitively expensive.

*Id.* at 497.

The *Metromedia* Court rejected San Diego's characterization of the ordinance as a reasonable time, place, and manner restriction because "the ordinance distinguish[ed] in several ways between permissible and impermissible signs at a particular location by reference to their content." *Id.* at 516. Thus, the court refused to apply the deferential balancing test applicable to content neutral regulations.

Instead, the Court employed a two-tier standard of review to determine the constitutionality of the ordinance. The Court first considered the impact of the ordinance on commercial speech, applying the *Central Hudson* test. The Court then applied the stricter balancing test to review the effect of the ordinance on noncommercial speech.

The Court concluded that "insofar as it regulates commercial speech the San Diego ordinance meets the constitutional requirements of *Central Hudson.*" *Metromedia*, 453 U.S. at 512. The Court noted that the commercial advertising at issue did not involve unlawful activity and was not misleading. *Id.* at 507. Further, the interests that the ordinance sought to advance — traffic

safety and the city's appearance — were "substantial governmental goals." *Id.* at 507-08. Finally, the Court opined that, because the city "has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs," the city "has gone no further than necessary in seeking to meet its ends." *Id.* at 508.

Insofar as San Diego's ordinance banned signs displaying noncommercial communications, however, the Court held that the ordinance was unconstitutional. The Court observed that although it had "consistently accorded noncommercial speech a greater degree of protection than commercial speech," the San Diego ordinance had precisely the opposite effect. *Id.* at 513. The ordinance provided "a broad exception for onsite commercial advertisements, but [provided] no similar exception for noncommercial speech." *Id.*

The Court found the ordinance infirm on another ground as well. The ordinance contained exceptions that permitted various kinds of noncommercial signs, "whether on property where goods and services are offered or not, that would otherwise be within the general ban." *Id.* at 514. Noncommercial signs other than the kinds expressly excepted, however, were prohibited. For this additional reason, the ordinance violated the First Amendment.

> Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests. With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.

*Id.* at 514-15 (citations omitted) (quoting *Consol. Edison Co.*, 447 U.S. at 538).

## IV

At the outset, we must determine what type of speech the ordinance in question regulates. Section 13-336 defines an "off-premises sign" as "[a] sign structure advertising an establishment, merchandise, service or entertainment, which is not sold, produced, manufactured or furnished at the property on which said sign is located." We find this definition sufficiently broad to include advertising that is both commercial and noncommercial in nature. Section 13-339(e) prohibits, *inter alia*, all off-premises signs with certain exceptions not relevant here. Thus, the ordinance generally prohibits all off-premises signs, whether commercial or noncommercial.[4]

Section 13-336 defines an "on-premises sign" as one "which pertains to the use of the property on which it is located." We likewise find this definition broad enough to include commercial as well as noncommercial advertising. Because the ordinance nowhere specifically prohibits "on-premises signs," we construe the ordinance to permit all such signs, whether commercial or noncommercial.

Examining the ordinance against the background of pertinent Supreme Court decisions, we must reject the City's characterization of its ordinance as a valid time, place, and manner restriction. Like San Diego's ordinance in *Metromedia*, the City's ordinance does not generally ban billboards everywhere as an unacceptable manner of communication. To the contrary, the ordinance permits various kinds of signs, distinguishing between permissible and impermissible signs at a particular location by reference to the subject matter of the signs. *See* Sections 13-336, -338, -339. We conclude, therefore, that the constitutionality of the ordinance cannot be determined using the deferential time, place, and manner balancing test because the ordinance regulates billboards based on the content of the signs.

We will assume, without deciding, that insofar as the ordinance regulates commercial speech, it meets the test enunciated in *Cen-*

---

[4] The City argues that the ordinance regulates only commercial advertising and "does not regulate noncommercial speech at all." We summarily reject this argument because the City's enforcement policy clearly belies the City's position. As previously noted, Adams' signs are used to display noncommercial as well as commercial messages. The Zoning Administrator, however, ordered the removal of *all* Adams' signs except those exempted under Code § 33.1-370, which relates to outdoor displays along interstate and federal-aid primary highways.

*tral Hudson* and applied in *Metromedia*. However, we will examine the ordinance as it relates to noncommercial communications, bearing in mind that the Supreme Court has "consistently accorded noncommercial speech a greater degree of protection than commercial speech." *Metromedia*, 453 U.S. at 513.

■ Although the ordinance prohibits all sign structures, commercial and noncommercial, that do not pertain to the activity conducted on the property where the sign is located, many kinds of signs are specifically exempted from the ordinance. Exemptions include: signs denoting revivals or other functions of religious or nonprofit organizations; bulletin boards for places of worship; construction signs; menu boards; noncommercial signs containing information about directions and safety; political signs located at campaign headquarters; professional nameplates attached to buildings; public, institutional, or religious building identification signs, real estate signs; real estate open house signs; residential subdivision development signs; special event signs that are limited to civic or cultural events, special decorative displays, and displays announcing the opening or reopening of a new business or profession; traffic or municipal signs; and "[u]rban signs addressed by the Newport Centre Urban Design Plan." *See* Section 13-338.

■ While many of the exemptions pertain to noncommercial signs, the ordinance does not contain a general exemption for all noncommercial communications. Thus, while the ordinance permits the display of a sign that pertains to the activities, commercial or noncommercial, performed on the premises, the ordinance bans the use of the same sign for noncommercial messages unrelated to the activities performed on that location. For example, an automobile dealer may use a billboard to advertise the sale of his motor vehicles, but he is prohibited from placing upon the same sign a message such as "Give the United Way." This restriction on noncommercial speech abridges freedom of speech as guaranteed by both the Federal and Virginia Constitutions. Indeed, this ordinance suffers from an infirmity similar to that suffered by the ordinance in *Metromedia*:

> There is a broad exception for onsite commercial advertisements, but there is no similar exception for noncommercial speech. The use of onsite billboards to carry commercial messages related to the commercial use of the premises is freely permitted, but the use of otherwise identical billboards

to carry noncommercial messages is generally prohibited. The city does not explain how or why noncommercial billboards located in places where commercial billboards are permitted would be more threatening to safe driving or would detract more from the beauty of the city. Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.

453 U.S. at 513.

The ordinance also displays an impermissible preference for commercial speech over noncommercial speech in the exemptions listed in Section 13-338. For example, a new business establishment may employ an off-premises sign to announce a grand opening, Section 13-338(l)(3), and a realtor may promote an "open house" with an off-premises sign, Section 13-338(j). No exemption, however, permits the employment of an off-premises sign to display any noncommercial message, such as "Save the Whales." Similarly, the ordinance does not permit a candidate running for political office to use an off-premises sign to promote his political beliefs. Section 13-338(f) (limiting display of political signs to campaign headquarters).

Because the ordinance favors commercial speech over noncommercial speech, it is an impermissible restriction on speech protected by the Federal and Virginia Constitutions. Thus, we hold that the ordinance, in its present form, is unconstitutional and invalid.[5]

Accordingly, we will reverse the trial court's judgment and enter final judgment for Adams.

*Reversed and final judgment.*

[5] Although we assumed, without deciding, that the ordinance's restrictions on commercial speech are constitutional, our holding has the effect of nullifying the ordinance in all respects as it applies to billboards. In reaching this conclusion, we are fully aware that the ordinance provides that its "various parts, sections and clauses . . . are . . . severable" and "[i]f any part, section or clause is adjudged invalid, the remainder shall remain in full force and effect." Section 13-344. However, because the ordinance's restrictions on commercial and noncommercial speech are so inextricably intertwined, the severability provision cannot save any part, section, or clause of the ordinance as it applies to billboards.