Present: Hassell, C.J., Koontz, Kinser, Lemons, Goodwyn, and
Millette, JJ., and Carrico, S.J.

E. DUANE HOWARD

OPINION BY
v.  Record No. 080383        SENIOR JUSTICE HARRY L. CARRICO
                                       January 16, 2009
COMMONWEALTH OF VIRGINIA


FROM THE COURT OF APPEALS OF VIRGINIA

In a bench trial in the Circuit Court of the City of
Roanoke, the defendant, E. Duane Howard, was convicted on a
summons charging him with disorderly conduct in violation of
Section 21-9(a)(2) of the Roanoke City Code for his alleged
disruption of a meeting of the city council.  The circuit court
imposed upon Howard a fine of $100.00, suspended upon condition
that he keep the peace and be of good behavior for a period of
six months.  Howard appealed his conviction to the Court of
Appeals of Virginia.  In a published opinion, the court affirmed
Howard's conviction.  <u>Howard v. City of Roanoke</u>, 51 Va. App. 36,
654 S.E.2d 322 (2007).  We awarded Howard this appeal.  We will
also affirm his conviction.

Roanoke City Code § 21-9 provides in pertinent part as
follows:

> (a) A person is guilty of disorderly conduct if, with the
> intent to cause public inconvenience, annoyance or alarm,
> or recklessly creating a risk thereof, he:
>
> . . . .

(2) Wilfully . . . disrupts any meeting of the city council . . . if such disruption prevents or interferes with the orderly conduct of such meeting . . .; provided, however, such conduct shall not be deemed to include the utterance or display of any words.

Roanoke City Code § 21-9 parallels the provisions of Va. Code § 18.2-415, which authorizes the governing bodies of counties, cities, and towns "to adopt ordinances prohibiting and punishing the acts and conduct prohibited by this section."  The state statute includes the same exception as the Roanoke City Code regarding "the utterance or display of any words."

<u>BACKGROUND</u>

The following narrative is taken from a transcript of the evidence at trial and a videotape of the city council meeting in question.  The meeting was held on November 7, 2005, for public discussion of the question whether Roanoke's Victory Stadium, a memorial to World War II veterans, should be renovated or demolished.  The issue was an emotional one, and the council chamber was filled to capacity with other attendees viewing proceedings on a remote television in another room.

Officer John T. Rogers of the Roanoke City Police Department was assigned to provide security at the meeting. Prior to the scheduled two o'clock p.m. start of the meeting, Howard and a companion engaged Officer Rogers in conversation and asked him why he was present.  Rogers replied that he "was there to make sure that everything ran fast and smoothly and

2

everything was secure." Rogers was questioned about whether he would ask people "to leave," and he replied, "yes, sir." Howard asked, "what if they don't want to leave?" Rogers responded, "sir, fortunately there's a thing called pain compliance." Howard "just kind of halfway laughed."

At the two o'clock beginning of the meeting, Mayor Nelson Harris made an opening statement in which he outlined the rules that would apply to the meeting. The rules provided that each of the 54 scheduled participants could speak only once for three minutes from the podium, that comments would be confined to the issue of the disposition to be made of Victory Stadium, and that no "outbursts" or "verbal attacks . . . against city council or any other people" would be tolerated. The mayor told the audience that police officers were present "to make sure that [the rules were] enforced" and that any offenders would "first . . . be asked to leave, and if they didn't," the officers would "escort them out."

Howard was one of the scheduled speakers, and after his turn at the podium he took a seat at the rear of the council chamber. At 4:10 p.m., the twenty-seventh speaker, John Kepley, stated that the middle initial of the mayor's name, "L.," meant "liar." The mayor "stopped the council meeting," stated "that this would not be tolerated," again "laid down the rules of

3

exactly what he expected," and urged everyone to conduct themselves in a civil manner.

Howard interrupted the mayor, "yelling out loud," with his hands "[c]upped around his mouth" and saying, "let him speak, let him speak." While "[e]verybody was a little bit rumbling, [Howard] was the loudest all the way from the back row."

The mayor said, "Mr. Howard," and then called out, "where is the police officer? Where is the officer?" Officer Rogers, who had stepped outside the council chamber to speak to his relief, Officer Johnson, heard the mayor's call for "the police officer" over the intercom. Officer Rogers immediately returned to the council chamber and approached Howard, whereupon the mayor said, "thank you sir, thank you sir. Council stands in recess, Mr. – officer," and rapped the gavel.

Officer Rogers approached Howard from the back because "he's on the last row." The officer "bent over" Howard and said, "you've already had your time . . . why don't you be a gentleman, stand up with me, and we'll walk out of here like two . . . full-grown adults?" Howard responded, "I have a right to speak." Officer Rogers asked Howard again, "why don't you stand up and walk with me?" Howard replied, "if you want me out of here, you have to drag me out." Officer Rogers asked two women sitting alongside Howard to move. When they had moved, Officer Rogers came around in front of Howard and he and Officer Johnson

4

tried to get Howard to stand up but he said again, "[i]f you want me out, you have to drag me out." Officer Rogers then "put on [Howard] what we call a wristlock," which made Howard "stand up." Officer Rogers "walked [Howard] out applying pressure each time he went to stop."

Once outside the council chamber, Howard claimed that Officer Rogers had broken his wrist, and Officer Rogers asked him "if he wanted rescue." Howard replied, "yes," the rescue squad was summoned, and Howard "went with the rescue." Officer Rogers later went to a magistrate and secured the summons upon which Howard was tried in the circuit court.

Howard testified in his own defense at trial. He conceded that the mayor had the right to establish rules for the meeting, that he broke the rules by speaking out of turn and not having been recognized to address the council from the podium, that the mayor was speaking when he, Howard, was "yelling out," and that he resisted Officer Rogers' request to leave by saying, "you would have to drag me out."

On appeal, Howard argues that a violation of the mayor's rules is not an element of the crime of disorderly conduct. Howard says that while the mayor "had a right to set rules and enforce rules that don't violate the First Amendment, he did not have the right to create for that one day a new element of the crime of disorderly conduct under Roanoke City [Code §] 21-9."

5

Continuing, Howard asserts that "[a] person can be guilty of violating the rules of the meeting (a civil violation) without being guilty under the criminal [provisions of the Roanoke City Code]."

Howard next argues that Roanoke City Code § 21-9 was enacted to punish conduct and not words and, with the exclusion of "the utterance . . . of any words" from its coverage, has insulated him from any criminal responsibility for his "let him speak, let him speak" utterance at the council meeting. He concedes that he was not insulated from all consequences, that "the mayor had a right to [evict] people who violated his rules [from] the meeting," but contends that the "matter should have ended when [he] was escorted from the city council chambers." And, Howard maintains, the fact he may have "yell[ed] loudly" does not make him a criminal. He asks, "[w]ho is to determine when the volume rises to criminal levels?" "This blurring of the line between conduct and speech," Howard opines, "could result in arguments that the statute is unconstitutionally vague."

Howard also argues that, while "[t]here was conduct during the recess that the Commonwealth could argue was disorderly," he is not criminally responsible for his refusal to leave the council chamber when ordered to do so. "[A]t that point, there was no public meeting going on," Howard avers, "so there was

6

nothing that prevented or interfered with the orderly conduct of the meeting."

## ANALYSIS

In Adams Outdoor Advertising v. City of Newport News, 236 Va. 370, 381, 373 S.E.2d 917, 922 (1988), we stated as follows:

> To safeguard free speech, the Supreme Court requires that a regulatory measure be content neutral.  The doctrine of content neutrality provides that governmental regulations may not "restrict expression because of its message, its ideas, its subject matter, or its content." Police Dept. of City of Chicago v. Mosley, 408 U.S. 92, 95 (1972).

> The doctrine of content neutrality, however, does not preclude all governmental regulation that restricts expression.  Restrictions on the time, place, and manner of expression are permissible if "they are justified without reference to the content of the regulated speech, . . . serve a significant governmental interest and . . . leave open ample alternative channels for communication of the information."  Virginia Pharmacy Board v. Virginia Citizens Consumer Council, 425 U.S. 748, 771 (1976).

Furthermore, "[a]lthough citizens may be given the privilege to speak during a public meeting, the right to do so is not unlimited."  Mannix v. Commonwealth, 31 Va. App. 271, 280-81, 522 S.E.2d 885, 890 (2000).  "Whether the forum be the courtroom or the chamber of the legislature itself or of a political subdivision of the State, there must be order.  It is frivolous to suggest the First Amendment stands in the way of that imperative."  State v. Smith, 218 A.2d l47, 150 (N.J. 1966).

7

Howard correctly argues that the exception in Roanoke City Code § 21-9 pertaining to the "utterance . . . of any words" has a plain meaning and needs no interpretation. See Jenkins v. Johnson, 276 Va. 30, 34-35, 661 S.E.2d 484, 486 (2008). Howard is also correct in arguing that, since the Code section is criminal in nature, it must be strictly construed against the Commonwealth. See Jones v. Commonwealth, 276 Va. 121, 124, 661 S.E.2d 412, 414 (2008).

We agree with Howard that a violation of the mayor's rules is not an element of the crime of disorderly conduct. This does not mean, however, that conduct which violates the rules cannot also be a violation of Roanoke City Code § 21-9.

With respect to Howard's argument that the Code section's exclusion from coverage of the "utterance . . . of any words" insulates him from any criminal responsibility for saying what he did just before the recess, we will give him the benefit of the doubt and assume for the purpose of this discussion that he is not punishable for saying, "let him speak, let him speak." We will give the same treatment to Howard's argument on the loudness issue and assume that he is not punishable because he "yell[ed] loudly" during the city council meeting.[*]

---

[*] This treatment of the loudness question renders moot Howard's contention that any "blurring of the line between conduct and speech could result in arguments that the [Roanoke City Code section] is unconstitutionally vague."

8

It does not follow, however, that we must reverse Howard's conviction.  His troubles did not end when he stopped yelling. We disagree with Howard's contention that he cannot be held accountable for his conduct after the recess was called, conduct he admits "the Commonwealth could argue was disorderly," because there was then "no public meeting going on so there was nothing that prevented or interfered with the orderly conduct of the meeting."

The circuit court held at one point in the trial that the mayor "called the recess because [Howard] was disrupting the meeting" and at another point that "the recess was called solely to facilitate the removal of Mr. Howard from the chambers." Howard does not question either ruling.  Indeed, Howard's counsel said with respect to the latter ruling that, "I accept that ruling."  It is the client, however, who must accept the consequences of the rulings:  Howard will not be allowed to use the recess he caused as a shield against the disorderly conduct in which he engaged during the recess.

Howard argues, however, that there was no evidence that his refusal to leave the council chamber lengthened the recess and thus disrupted the meeting.  "We do not know," Howard says, "whether the Council went out to dinner during the recess or how long the recess was . . . .  [I]t could literally have been a minute or two."  But Howard himself supplied some information on

9

the subject. He testified to the warnings the mayor gave "to people during the four (4) hours of council meeting." The meeting started at 2:00 p.m. The recess occurred about 4:10 p.m., after twenty-seven, or half, of the speakers had been heard and about two hours had passed. If the meeting ended at 6:00 p.m., as Howard's testimony indicates, after twenty-seven more speakers had been heard and another two hours had passed, it is highly unlikely the council members went out to dinner or otherwise lingered during the recess.

In any event, how long the recess lasted is irrelevant. What is relevant is the length of time it took the police officers to talk to Howard in an effort to get him to leave peacefully, to get him on his feet by use of a wristlock when that effort failed, and to force him by "pain compliance" across the chamber and out the chamber door, force sufficient to make Howard think his wrist had been broken by Officer Rogers.

Whether the time taken to remove Howard was one or two minutes or something more or less, it was of sufficient length to disrupt the meeting in a manner proscribed by the Roanoke City Code section. As the circuit court stated in finding Howard guilty, "the conduct associated with [Howard's] removal . . . certainly lengthened . . . the recess and prevented the orderly conduct of the meeting."

That the disruption was wilful cannot be doubted.  Howard disclosed his disruptive inclinations in his conversation with Officer Rogers before the meeting even started and continued to display them throughout the meeting until he was finally evicted from the council chamber.

CONCLUSION

The evidence amply supports the conclusion that Howard, "with the intent to cause public inconvenience [and] annoyance, . . . [w]ilfully . . . disrupt[ed the] meeting of the city council [of Roanoke on November 7, 2005, and] such disruption prevent[ed] or interfere[d] with the orderly conduct of such meeting."  Hence, he was properly proven guilty of disorderly conduct under Roanoke City Code § 21-9(a)(2).  Accordingly, we will affirm the judgment of the Court of Appeals.

Affirmed.