COURT OF APPEALS OF VIRGINIA

Present:    Judges O'Brien, AtLee and Senior Judge Petty
Argued by videoconference

AMY LYNN CHILDRESS

v.      Record No. 1843-23-3

JIMMIE DEWITT CHILDRESS, III

MEMORANDUM OPINION* BY
JUDGE MARY GRACE O'BRIEN
MARCH 24, 2026

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
Paul M. Peatross, Jr., Judge Designate

Amy Lynn Childress, *pro se*.

Jim D. Childress, III (Betsy E. Cornatzer, Guardian ad litem for the
minor children; The Law Office of Betsy E. Cornatzer, P.C., on
brief), *pro se*.

Amy Lynn Childress ("mother") appeals an order awarding Jimmie DeWitt Childress, III

("father") sole legal and physical custody of the parties' three children.  The court also barred

mother from contacting the children until she received a psychiatric evaluation to diagnose her

mental health condition and completed appropriate treatment—all subject to the court's approval.

In her first assignment of error, mother argues that the court imposed "coercive psychiatric

conditions"; discriminated against her based on mental health; violated due process of law and the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 to 12213; and unlawfully retained

jurisdiction under Rule 1:1.

In her second assignment of error, mother challenges various factual findings made by the

court in determining the children's best interests under Code § 20-124.3, and she again claims a

violation of due process.  Third, mother argues that the court violated her First Amendment right of

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

free speech by prohibiting her from posting about the case on social media. Finally, mother argues that these "cumulative errors . . . unconstitutionally terminated [her] parental rights." Finding no error, we affirm.

BACKGROUND[1]

Mother and father married in 2012 and divorced in 2022. Before the divorce was finalized, both parents petitioned for custody of their three children: twins born in 2015 and a third child born in 2016. A juvenile and domestic relations district court ("JDR court") awarded father sole legal and physical custody in October 2021. The JDR court ordered that mother "have no visitation unless and until she has engaged in and is making significant progress, as documented by [her] provider(s), in the therapies listed in the Addendum." The Addendum required, among other things, a psychiatric evaluation and individual therapy. Mother appealed to the circuit court for de novo review.

The circuit court trial lasted seven days scattered between October 2022 and September 2023. The first four days dealt with mother's motion to remove the children's guardian ad litem ("GAL"). The court denied the motion and incorporated all evidence into the merits of the custody and visitation dispute.

Mother was pro se in circuit court. She had fired one attorney, and another had withdrawn. A third attorney, Janet Moran, had been appointed as GAL for mother in the JDR court. However, the circuit court relieved Moran of her duties on the first day of trial because mother had refused to communicate with her. The court later revisited appointing a GAL for mother because it had

---

[1] On appeal, we view "'the evidence in the light most favorable'" to father because he prevailed below; we give him "the benefit of any reasonable inferences." *Veldhuis v. Abboushi*, 77 Va. App. 599, 602 n.2 (2023) (quoting *Young Kee Kim v. Douval Corp.*, 259 Va. 752, 756 (2000)). Further, "[t]o the extent that this opinion discusses facts found in sealed documents in the record, we unseal only those facts." *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

received a report questioning her competency to stand trial in a separate criminal proceeding, but mother declined the appointment.

In support of her custody petition, mother claimed that father verbally and physically abused her, lied to the children, and abused his Adderall prescription. Father presented a different account, which the court found more credible. He testified that mother's personality changed in the summer of 2020: she withdrew from parenting duties, filmed him constantly, and "pushed, kicked, punched, and chased [him] with a knife" and "confronted [him] with a gun."

Mother also began behaving erratically in public. A preschool and a pediatrician's office asked the family not to return, due to her misconduct. A second preschool allowed the children to enroll but barred mother from the premises "because of her manic behavior such as barging into a classroom uninvited." In January 2021, mother was temporarily committed in a civil proceeding initiated by her sister. Mother then severed ties with extended family members, and she alienated neighbors and the children's playmates. Father assumed all responsibilities for the children, adjusting his law practice so that he could attend to their needs.

In March 2021, after an initial grant of sole custody to father, mother began supervised visitation with the children at the local YMCA. Brenda Dunning, a YMCA coordinator, observed several visits and noted that although mother at times engaged well with the children, she blamed the court for the family's troubles and the children became "very aggressive as the visitations progressed." Dunning heard the children comment on the animosity between the parents and make "disturbing" remarks about the parents' body parts, which she reported to the children's GAL.

Father testified that the supervised visitation "did not go well at all" and was "negatively [a]ffecting the children." Mother fixated on "marital dynamics rather than the children" during visitation. On father's motion, the JDR court terminated the YMCA sessions in July 2021. Mother continued with video visitation via FaceTime, but she repeatedly told "the children that [father was]

violating their [c]onstitutional rights" and "alienating them from their mother," and she would "fake cry with no tears to get sympathy." The JDR court terminated all visitation in October 2021. Father also obtained a protective order against mother, barring contact with him.

At trial, the children's GAL testified that mother had not engaged in therapy as required by the JDR order and could not currently provide a "healthy, stable, and dependable environment" for the children. The GAL reiterated her concerns that (1) "mother does not appear to have any insight into the fact that her lack of cooperation with [c]ourt[-][o]rdered mental health services is what has kept her from being able to resume contact with her children"; and (2) "[there] appears to be an overall mental health decline for the mother, and her behavior in the community." The GAL recommended that "all three children remain in the sole care and custody of . . . father."

Dr. Megan Hall, a licensed clinical psychologist, evaluated each party's parental capacity—a process that involved psychological testing—and reported her findings to the court. Dr. Hall found that mother displayed "instability in interpersonal relationships," "reactivity of mood," "inappropriate or intense anger," and had "difficulty controlling her resultant behaviors." Although mother reportedly experienced trauma and distress in childhood, the "full extent" was unknown due to mother's "guardedness during emotional/behavioral and personality testing." Dr. Hall acknowledged that mother had "previous diagnoses of PTSD and ADHD," had "previously displayed symptoms of [b]ipolar [d]isorder," and was "currently displaying symptoms associated with mania." Further, the psychologist noted that mother "cannot sleep unless she uses her THC prescription." These and other factors "have likely impacted her parenting practices." Dr. Hall diagnosed mother with a personality disorder and stated that, due to her "overlapping symptomatology," additional "observation and follow[-]up with treatment recommendations [were] warranted." At trial, Dr. Hall testified that mother had made no progress since the parental capacity

evaluation was completed in September 2021 and needed to "address[] her mental health issues" before resuming contact with the children.

Dr. Hall reported favorably on father's parental capacity, particularly his "consistency, stability, dedication, and love for his children," and recommended ongoing psychiatric monitoring and counseling to address mental health issues arising from the dispute with mother. Father helped the children reestablish connections with extended family members and friends, and he expressed hope that mother could regain her health and parental capacity.

The court issued a letter opinion addressing the factors for determining child custody in Code § 20-124.3. Regarding Code § 20-124.3(2), "[t]he age and physical and mental condition of each parent," the court found that mother's mental condition was the "major issue" and adopted the clinical findings of Dr. Hall as set forth in her parental capacity report. The court ultimately concluded that it was in the children's best interests for father to have sole legal and physical custody. Further, the court determined that mother's mental condition precluded her from having any contact with the children. To reestablish contact, mother was ordered to undergo a psychiatric evaluation and complete appropriate treatment—all subject to court approval. Specifically, the court ruled as follows: "Upon the successful completion of [mother's] treatment, the treating health professional shall submit a report to the [c]ourt for its review and consideration of reinstatement of [mother's] parental rights to see her children." The court entered an order incorporating the letter opinion in October 2023.

## ANALYSIS

### I. Standard of Review

"Custody and visitation matters are reviewed for abuse of discretion." *Brandon v. Coffey*, 77 Va. App. 628, 635 (2023). "The trial court's decision on factual issues is entitled to great weight and will not be disturbed unless plainly wrong or without evidence to support it." *Id.* (quoting

*Rainey v. Rainey*, 74 Va. App. 359, 377 (2022)). "So 'long as the evidence in the record supports' the circuit court's determination and it 'has not abused its discretion, its ruling must be affirmed on appeal.'" *Id.* (quoting *Rainey*, 74 Va. App. at 377). To the extent mother challenges the circuit court's statutory and constitutional interpretations, we review those issues de novo. *See Copeland v. Todd*, 282 Va. 183, 193 (2011).

## II. First Assignment of Error

In her first assignment of error, mother argues the court "impos[ed] coercive psychiatric conditions," discriminated against her, violated the ADA, declared her incompetent without due process of law, and unlawfully retained jurisdiction in violation of Rule 1:1.

### a. Requiring Psychiatric Diagnosis and Treatment

"In all child custody cases . . . 'the best interests of the child are paramount and form the lodestar for the guidance of the court in determining the dispute.'" *Bottoms v. Bottoms*, 249 Va. 410, 413 (1995) (quoting *Bailes v. Sours*, 231 Va. 96, 99 (1986)). Because of this paramount concern, the court has broad discretion to impose conditions necessary to protect the child's welfare. *See Farley v. Farley*, 9 Va. App. 326, 328 (1990); *Brown v. Brown*, 30 Va. App. 532, 538 (1999) ("[T]he trial court has broad discretion in determining what promotes the children's best interests."). A court's determination of matters within its discretion is reversible on appeal only for an abuse of that discretion. *Farley*, 9 Va. App. at 328.

Code § 20-124.2(D) authorizes courts to order psychological or mental health evaluations to assist in determining the child's best interests in custody or visitation disputes, and Code § 20-124.3(2) requires the court to consider each parent's mental condition in "determining best interests of a child for purposes of determining custody or visitation arrangements." If a parent's untreated mental health issues are found to negatively impact the child, the court may impose conditions—such as psychiatric treatment—to address those concerns before allowing contact to

resume. *See Joynes v. Payne*, 36 Va. App. 401, 417 (2001) ("The weight to be placed on this single factor, namely [mother's] physical and mental condition, was within the discretion of the . . . fact finder.").

Although a court cannot delegate its decision-making authority in contested visitation cases, it may order therapeutic interventions and monitor a parent's compliance to facilitate the children's welfare. *See Rainey*, 74 Va. App. at 384-87. "[I]t is appropriate for the court to consider the opinion of a qualified third party in making visitation determinations." *Id.* at 387 n.8; *see also Vechery v. Cottet-Moine*, No. 0636-20-4, slip op. at 5-6, 2021 Va. App. LEXIS 94, at *9-*10 (June 15, 2021) (finding no error in requiring father, who previously stalked child and assaulted mother, to complete an anger-management program and attend therapy before petitioning to resume visitation).[2]

Considering these principles, we find no abuse of discretion in conditioning mother's access to her children on submitting to court-monitored psychiatric evaluation, diagnosis, and treatment. The record is clear that mother's deteriorating mental condition severely limited her parental capacity, negatively affected her children's welfare, and caused her to behave inappropriately. She had been barred from the children's school and pediatrician's office due to erratic behavior, she alienated family and friends, and she lacked understanding about the need for treatment. She displayed an array of overlapping symptoms for several psychiatric conditions. Thus, in keeping with its obligation to facilitate the children's welfare and protect their best interests, the court did not err in requiring mother to obtain a diagnosis and comply with recommended treatment. Similarly, the court properly retained authority to approve mother's doctor, diagnosis, and treatment plan; such

---

[2] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Smith v. Commonwealth*, 78 Va. App. 371, 383 n.4 (2023) (quoting *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012)); *see* Rule 5A:1(f).

oversight protects the best interests of the children by ensuring the quality of mother's treatment and potential restoration of her parental capacity. *See Rainey*, 74 Va. App. at 387 n.8.

Nothing in the record supports mother's claim that compliance with the conditions is impossible and that no doctor will submit to the court's oversight. For these reasons, we affirm the court's decision.

### b. Due Process and ADA Protections

Mother argues that the court declared her incompetent without an evidentiary hearing, violating due process of law and ADA protections.

"'[D]ue process of law' requires that a person shall have reasonable notice and a reasonable opportunity to be heard before an impartial tribunal, before any binding decree can be passed affecting [her] right to liberty or property." *Tidwell v. Late*, 67 Va. App. 668, 687 (2017) (quoting *Menninger v. Menninger*, 64 Va. App. 616, 621 (2015)). Additionally, the ADA requires that public entities, including courts, make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i); *see* 42 U.S.C. § 12131(1).

The procedural history shows that mother's due-process and ADA arguments are without merit. The JDR court had initially appointed a GAL (Janet Moran) for mother, but the circuit court subsequently relieved Moran of her GAL duties when mother refused to talk to her. Mother proceeded pro se. The trial began in October 2022 but did not end until September 2023. At a status hearing in August 2023, the court revisited whether to appoint a GAL for mother—because a psychiatrist had questioned her competency to stand trial in a separate criminal matter. The court told mother that she was "deemed as a person under [a] disability" and "entitled to have a [GAL] appointed to assist [her] in trying the custody cases." The court also presented this information to mother in writing. She declined the appointment of a GAL. The court then advised mother of her

right to challenge the psychiatrist's competency report in the criminal matter, pursuant to Code § 19.2-169.1(E), and explained the availability of court-appointed counsel for that proceeding.

Mother subsequently filed a "request for accommodation under the Americans with Disability Act" seeking "consideration for her ADHD and anxiety." She said she now "need[ed] to have a GAL appointed to accompany me in court." When trial resumed in September 2023, the court reviewed this ADA request, described it as an "ex parte communication," but nevertheless agreed to "grant her the accommodations for her ADHD and anxiety" and "to oversee the hearing so there's no aggressiveness towards her, no interrupting her." However, the court reiterated that mother had previously declined the appointment of a GAL, had already had a prior GAL removed, and had terminated relationships with two other lawyers. The court declined to appoint her a GAL at this stage. Mother insisted that she did not want a GAL but, instead, a court-appointed lawyer. Finding no legal authority for that request, the court denied it as well.

The record reflects that the court did not violate mother's due process rights or the ADA. To the contrary, it notified her of the challenge to her competency in the separate criminal matter, provided several opportunities to obtain representation, and implemented her request for ADA accommodations for her ADHD and anxiety.

c. Rule 1:1

Additionally, by imposing conditions on mother's visitation rights, the court did not unlawfully retain jurisdiction beyond 21 days. Code § 20-124.2(E) gives courts "continuing authority and jurisdiction to make additional orders necessary to effectuate and enforce" its custody and visitation orders. Code § 20-108 empowers a court to modify custody and visitation orders due to changed circumstances. A court's ongoing authority under either statute is not limited by the

timeframe of Rule 1:1(a), which would otherwise allow only 21 days to modify orders.[3] *See Eichelberger v. Eichelberger*, 2 Va. App. 409, 412 (1986) ("Once a court has ruled on matters relating to the custody and care of minor children, and visitation rights of the non-custodial parent, the court retains jurisdiction throughout the minority status of the child involved."); *see also Ferguson v. Grubb*, 39 Va. App. 549, 560 (2003) (holding that Code § 20-124.2 permits "continued intervention of the court . . . to protect the best interests of the children"). Thus, the court retained jurisdiction to monitor mother's compliance with its October 2023 order and to consider reinstating visitation rights if she satisfied all requirements.

## III. Second Assignment of Error

In her second assignment of error, mother challenges various factual findings made by the court. Specifically, she contends that the court "misrepresented [father's] drug use, ignored expert testimony, and falsely attributed visitation termination to mother." We disagree.

### a. Father's Drug Use

Mother challenges the court's factual findings concerning father's use of Adderall, which his physician Dr. James Meadows first prescribed in June 2020 to treat ADHD.[4] Although mother claims father abused the drug, the court found that "Dr. Meadows monitored the use by monthly drug screens and found no abuse" and "[father] ceased taking the drugs as of March 2022." Disputing these findings, mother relies on evidence that father gave "contradictory statements under oath" about Adderall. She also argues that father's drug tests "exhibited alarming inconsistencies"

---

[3] Rule 1:1(a) provides, "All final judgments, orders, and decrees, irrespective of terms of court, remain under the control of the trial court and may be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer."

[4] In its letter opinion, the court misidentified the first prescription date as June 2021, but other evidence in the record—including Dr. Meadows's testimony—shows that it was June 2020.

and thus demonstrated Adderall abuse. Additionally, according to mother, both Dr. Meadows and the court failed to consider that father had used cocaine 20 years earlier.

The evidence supports the court's finding that father was not abusing Adderall. Dr. Meadows testified extensively about his treatment of father not only for ADHD but also for depression and anxiety. Dr. Meadows explicitly testified that "there's no indication of him misusing [Adderall] in any of our records or any of our follow-up [appointments]." The parental capacity evaluation authored by Dr. Hall likewise found no evidence of substance abuse. Because the court's factual finding is not plainly wrong, we will not disturb it on appeal. *Brandon*, 77 Va. App. at 635.

b. YMCA Visitation Termination

Next, mother argues the court "falsely attributed the termination of YMCA visits to [m]other's conduct."

Contrary to mother's argument, the court did not explicitly attribute to her the termination of YMCA visitation. Instead, the court found that "[t]he visitation had issues and was terminated by [father]." The record supports this finding. Father testified that the YMCA visitation did not go well and was negatively affecting his children. The YMCA coordinator observed that the children were preoccupied by their parents' animosity and grew increasingly aggressive. Father filed a motion in the JDR court to terminate the YMCA visitation. The JDR court granted the motion and ordered that visitation could not resume until mother made "significant progress" in psychiatric therapy. The circuit court did not delve into the specific issues that arose during the YMCA visitation, and mother claims other evidence in the record supported reinstating it. But even accepting the evidence supporting her claims as true, it does not conflict with the court's actual— and essentially neutral—finding that "[t]he visitation had issues and was terminated by [father]." Furthermore, the court's set of conditions for psychiatric diagnosis and treatment paved a way for

- 11 -

mother to reach her desired outcome—reinstatement of contact. Therefore, the court did not err in its findings regarding the termination of the YMCA visitation.

c. Witnesses Concerning Mother's Parental Fitness

Mother argues the court "explicitly ignored unanimous expert findings confirming [her] parental fitness and mental stability." Mother's argument is meritless for two reasons. First, there were no "unanimous expert findings" confirming her parental fitness and stability. The evidence was disputed on this issue, with the court favoring the conclusions of Dr. Hall in her parental capacity evaluation. Dr. Hall diagnosed mother with a personality disorder and found that she exhibited symptoms of ADHD and bipolar disorder. Because mother displayed overlapping symptoms for multiple psychiatric conditions, Dr. Hall recommended further "observation and follow[-]up with treatment recommendations." Although Dr. Hall's written evaluation, completed in September 2021, recommended resuming supervised visitation immediately, at trial Dr. Hall reached the opposite conclusion. Based on her observations of mother's emotional reactivity in court and in videos exhibited at trial, Dr. Hall revised her recommendation and concluded that mother "should be addressing her mental health issues first."

Second, mother's argument is meritless because the court did not "ignore" her witnesses but simply gave their testimony little weight. A circuit court's credibility determinations of witnesses—whether expert or lay—will not be second-guessed on appeal. *See Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 423 (2012) ("We are not permitted to conduct a trial *de novo* on appeal to second guess a trial court's credibility determination."). Here, the court gave greater weight to the evidence demonstrating that mother suffered from a mental health condition that did not permit her to have custody or contact with her three children until she properly addressed the condition. This evidence came from Dr. Hall's report and testimony as well as the court's own observations of mother: "In court she has been disruptive, erratic, rude, and disrespectful. Her

- 12 -

conduct in and out of court has not improved since 2020." Additionally, in providing a way for mother to reestablish contact with her children, the court acknowledged evidence that mother possessed a degree of parental capacity that could be rehabilitated with proper mental health diagnosis and treatment.

## IV. Third Assignment of Error

Mother next argues that the court violated her First Amendment right of free speech by prohibiting her from posting about the case on social media. Mother also argues that the court "unconstitutionally interfered with [her] therapeutic progress," as she benefits from "sharing her experiences on social media."

Code § 20-124.2 gives courts broad discretion in custody and visitation matters to safeguard the best interests of the child, and they retain continuing authority to issue orders necessary to enforce and effectuate custody and visitation arrangements. Nevertheless, the First Amendment requires that content-based restrictions on speech be narrowly tailored and justified by compelling interests. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if [the regulation] applies to particular speech because of the topic discussed or the idea or message expressed."); *see also Adams Outdoor Advert. v. City of Newport News*, 236 Va. 370, 381-82 (1988) (stating that content-based restrictions on speech must be "narrowly drawn" to serve a "compelling interest"). Courts have found that protecting children from harm and preserving the integrity of the judicial process are compelling state interests. *See Packingham v. North Carolina*, 582 U.S. 98, 111-12 (2017) (recognizing state's compelling interest in protecting children from harm); *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018).

Here, the court ordered both parties to "refrain from posting about this case, including but not limited to posting about the litigants, court personnel, counsel, and witnesses, on any social media." This restriction was content-based insofar as it prohibited social media posts on particular

- 13 -

topics. *See Reed*, 576 U.S. at 163. Nevertheless, the restriction was narrowly drawn to serve the compelling interests of protecting the parties' children and the judicial process. The record reflects that mother posted prolifically, often using social media platforms to disparage father and his law practice. She posted videos asserting that "he abused her [and] the children" and "abused drugs." The court found "no truth in these accusations" and determined that mother's "excessive and harmful" postings "damaged [father's] law practice, his reputation, and his emotional stability." Most significantly, these postings exposed the children to public scrutiny and indisputably implicated their welfare. The court's restriction was narrowly tailored, precluding posting specifically about "this case"—as opposed to a blanket ban on social media. The restriction did not single mother out for punishment; the restriction extended evenly to both parents for purposes of protecting the judicial process and the children's best interests. Therefore, the restriction did not violate mother's First Amendment rights.

## V. Fourth Assignment of Error

Mother's final argument is that the court's "cumulative errors . . . resulted in the unconstitutional termination of [her] parental rights." But no ruling by the court has made her a legal stranger to the children or permanently severed her ties to them. *Cf. Cage v. Harrisonburg Dep't of Soc. Servs.*, 13 Va. App. 246, 249 (1991) ("When a court orders termination of parental rights, the ties between the parent and child are severed forever[,] and the parent becomes 'a legal stranger to the child.'" (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986))). To the contrary, the court made clear that mother would be eligible for reunification upon completion of certain conditions—namely, court-approved psychiatric diagnosis and treatment.

These conditions were appropriate because mother's mental condition had not yet been fully assessed and diagnosed; as Dr. Hall's report demonstrates, mother exhibited an array of symptoms, including those of bipolar disorder. Requiring a full evaluation and diagnosis was an essential first

- 14 -

step toward establishing a treatment plan. Additionally, these conditions were appropriate because they contemplated diligent judicial oversight, rather than simply delegating authority to a healthcare provider or other third party. *Cf. Rainey*, 74 Va. App. at 385-88. By clearly articulating what mother needed to do to reestablish contact, the court protected her parental rights while serving the children's best interests. Because the court did not foreclose reunification, the order did not constitute a termination of parental rights under Code § 16.1-283. *See Vechery*, slip op. at 5-6, 2021 Va. App. LEXIS 94, at *9-*10.

Mother further argues that the court's denial of visitation until compliance with the conditions contained in the custody order violated her fundamental due process right under the Fourteenth Amendment to raise her children. "[T]he relationship between a parent and child is constitutionally protected by the Due Process Clause of the Fourteenth Amendment." *Copeland*, 282 Va. at 198. However, custody and visitation disputes between two parents often involve "one parent's fundamental right pitted against the other parent's fundamental right. The discretion afforded trial courts under the best-interests test, Code § 20-124.3, reflects a finely balanced judicial response to this parental deadlock." *Griffin v. Griffin*, 41 Va. App. 77, 83 (2003). Thus, a court does not err by deciding a case solely on the best-interests standard. *See Yopp v. Hodges*, 43 Va. App. 427, 439 (2004). As discussed above, the court properly used the best-interests standard and, in so doing, did not violate mother's constitutional rights.

CONCLUSION

The circuit court did not err in requiring that mother obtain a psychiatric diagnosis and complete appropriate treatment—all subject to court approval—before regaining contact with her children. Additionally, we find no error in the court's factual findings or in its order precluding mother from posting about the case on social media. Finally, the court's rulings did not constitute a

- 15 -

de facto termination of mother's parental rights but, rather, provided a path toward reunification with her children.  Therefore, we affirm.[5]

*Affirmed.*

---

[5] We deny all of mother's pending motions.