**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1762

In re:  MURPHY-BROWN, LLC,

Petitioner.

------------------------------

AMERICAN FARM BUREAU FEDERATION; NORTH CAROLINA FARM
BUREAU     FEDERATION;     NATIONAL     ASSOCIATION     OF
MANUFACTURERS; NORTH CAROLINA CHAMBER LEGAL INSTITUTE;
NORTH CAROLINA PORK COUNCIL; NATIONAL PORK PRODUCERS
COUNCIL; REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS;
AMERICAN SOCIETY OF NEWS EDITORS; THE ASSOCIATED PRESS;
ASSOCIATION OF ALTERNATIVE NEWSMEDIA; THE MCCLATCHY
COMPANY; THE MEDIA LAW RESOURCE CENTER, INC.; NATIONAL
PRESS   PHOTOGRAPHERS   ASSOCIATION;   THE   NEWS   MEDIA
ALLIANCE; NORTH CAROLINA PRESS ASSOCIATION; SOCIETY OF
PROFESSIONAL JOURNALISTS; TULLY CENTER FOR FREE SPEECH;
WRAL-TV,

Amici Supporting Petitioner.

On Petition for Writ of Mandamus from the United States District Court for the Eastern
District of North Carolina, at Wilmington.  W. Earl Britt, Senior District Judge.  (7:14-
cv-00180-BR;  7:14-cv-00182-BR;  7:14-cv-00183-BR;  7:14-cv-00185-BR;  7:14-cv-
00237-BR)

Argued:  September 25, 2018                    Decided:  October 29, 2018

Before WILKINSON and AGEE, Circuit Judges, and James P. JONES, United States
District Judge for the Western District of Virginia, sitting by designation.

Petition granted by published opinion.  Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Jones joined.

**ARGUED:**  Stuart Alan Raphael, HUNTON ANDREWS KURTH LLP, Washington, D.C., for Petitioner.  John S. Hughes, WALLACE & GRAHAM, PA, Salisbury, North Carolina, for Respondents.  **ON BRIEF:**  Robert M. Tata, Washington, D.C., Kevin S. Elliker, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Petitioner.  Ellen Steen, AMERICAN FARM BUREAN FEDERATION, Washington, D.C.; H. Julian Philpott, Jr., Phillip Jacob Parker, Jr., NORTH CAROLINA FARM BUREAU FEDERATION, Raleigh, North Carolina; Timothy S. Bishop, Michael B. Kimberly, MAYER BROWN LLP, Washington, D.C.; Eugene Volokh, UCLA SCHOOL OF LAW, Los Angeles, California, for Amici American Farm Bureau Federation and North Carolina Farm Bureau Federation.  Peter C. Tolsdorf, Leland P. Frost, MANUFACTURERS' CENTER FOR LEGAL ACTION, Washington, D.C.; Catherine E. Stetson, Sean Marotta, HOGAN LOVELLS US LLP, Washington, D.C., for Amici National Association of Manufacturers and North Carolina Chamber Legal Institute.  C. Amanda Martin, STEVENS MARTIN VAUGHN & TADYCH PLLC, Raleigh, North Carolina; Matthew Nis Leerberg, SMITH MOORE LEATHERWOOD, LLP, Raleigh, North Carolina, for Amici North Carolina Pork Council and National Pork Producers Council.  Michael C. Formica, NATIONAL PORK PRODUCERS COUNCIL, Washington, D.C., for Amicus National Pork Producers Council.  Bruce D. Brown, Katie Townsend, Caitlin Vogus, Sarah Matthews, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Washington, D.C., for Amici The Reporters Committee for Freedom of the Press and 11 Other Media Organizations.  Kevin M. Goldberg, FLETCHER, HEALD & HILDRETH, PLC, Arlington, Virginia, for Amici American Society of News Editors and Association of Alternative Newsmedia.  Karen Kaiser, General Counsel, THE ASSOCIATED PRESS, New York, New York for Amicus The Associated Press.  Juan Cornejo, THE MCCLATCHY COMPANY, Sacramento, California, for Amicus The McClatchy Company.  George Freeman, MEDIA LAW RESOURCE CENTER, New York, New York, for Amicus The Media Law Resource Center, Inc.  Mickey H. Osterreicher, Buffalo, New York, for Amicus National Press Photographers Association.  Kurt Wimmer, COVINGTON & BURLING LLP, Washington, D.C., for Amicus The News Media Alliance.  Bruce W. Sanford, Mark I. Bailen, BAKER & HOSTETLER LLP, Washington, D.C., for Amicus Society of Professional Journalists.

WILKINSON, Circuit Judge:

Petitioner challenges the United States District Court for the Eastern District of North Carolina's gag order imposing stringent restrictions on participants and potential participants in a series of nuisance suits brought against the hog industry in North Carolina. For the reasons that follow, we find the district court's order defective in multiple respects. We direct the district court to vacate the gag order and allow the parties to begin anew under the guidelines set forth below, and even then, only if exceptional circumstances warrant.

I.

Petitioner (and defendant below) seeks relief from a gag order controlling interrelated civil nuisance suits. The plaintiffs in those suits allege that nearby hog farms associated with Murphy-Brown, LLC are a private nuisance. Hog farming is a predictably messy business, but one with central economic importance to the state of North Carolina. Plaintiffs claim that the hog farms give rise to undue amounts of odors, insects, and pests, not to mention the noise and debris generated by raising hogs and shipping them for sale. In total, the Master Case Docket includes more than 20 lawsuits and more than 500 plaintiffs. Plaintiffs from five cases in the initial discovery pool have been grouped for eleven seriatim trials—three have already delivered large verdicts in plaintiffs' favor. The cases likely will take years to resolve.

Respondents (and plaintiffs below) support, in part, the gag order in this case. That order was based on a "significant increase in trial publicity" after the first two trials. Gag Order at 2 (J.A. 616). The hog nuisance suits touch on important matters of local and

3

regional concern. Sizable damages awards in the first two cases have generated legislative responses. It is no wonder that the press and the public have taken an interest, and that a lively, indeed passionate, debate has ensued.

The jury pools were, naturally, exposed to the publicity. Three juries have considered the hog nuisance suits. Of the jury pool for the first trial, two of the fifty potential jurors had been exposed to the issues of the case in some way. Of the second jury pool, eleven of fifty. Of the third, twenty-three of fifty. The majority of potential jurors with prior exposure to the case testified that they could impartially serve on one of the juries—two did in fact serve on the second one. Moreover, during the second trial, one juror conducted outside research and shared the results with other jurors, but the trial continued when jurors stated that they could remain impartial.

The present case addresses a gag order that the district court issued *sua sponte* while the second jury deliberated on June 27, 2018. The court found that "the volume and scope of prejudicial publicity observed" led to a "substantial risk of additional publicity tainting or biasing future jury pools." Gag Order at 3 (J.A. 617). The gag order was a sweeping one. It prohibited all parties and their lawyers, representatives, and agents, as well as "all potential witnesses," from:

> giv[ing] or authoriz[ing] any extrajudicial statement or interview to any person or persons associated with any public communications media or that a reasonable person would expect to be communicated to a public communications media relating to the trial, the parties or issues in this case which could interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice and which is not a matter of public record. Statements of information intended to influence public opinion regarding the merits of this case are specifically designated as information which could prejudice a party.

4

*Id.*

The gag order provides for limited exceptions. "[W]ithout elaboration or any kind of characterization," covered individuals may discuss "the general nature of an allegation or defense"; "information contained in the public record of this case"; "scheduling information"; "any decision made or order issued by the court which is a matter of public record"; and "the contents or substance of any motion or step in the proceedings, to the extent such motion or step is a matter of public record." *Id.* at 3-4 (J.A. 617-18).

On July 6, 2018, Murphy-Brown petitioned this court for mandamus relief from the gag order. We promptly ordered expedited review. On August 9—after partial appellate briefing and forty-three days after the gag order—respondents filed a motion in the district court asking it to clarify, modify, or vacate the gag order. The district court required parties to submit briefing on that motion two days after the expedited appellate briefing concluded. On August 31, the district court vacated its gag order. It further instructed parties to seek a new gag order for the third trial, if desired, by September 18, one week before we heard oral argument. Respondents filed a contested motion to dismiss the mandamus petition on mootness grounds on September 10. We held that motion in abeyance pending oral argument.

## II.

We first turn to the motion to dismiss the mandamus petition. Respondents contend that the district court's August 31 order rescinding the gag order somehow moots the mandamus petition. We disagree. Not only was the August 31 order invalid, but the

ordinary application of mootness doctrine comfortably allows this court to reach the merits of the gag order.

A.

The mandamus petition is not moot because the August 31 order exceeded the trial court's authority vis-à-vis the court of appeals. Petitioner urges us to say that the district court lacked jurisdiction to declare its earlier order ineffective. But we need not speak broadly or rigidly in jurisdictional terms. It is enough to observe that in the circumstances here the district court's decision to revisit its June 27 gag order was ill-advised.

In analogous circumstances on direct appeal, district courts formally lose jurisdiction over the questions being appealed. For example, we have held "that a district court loses jurisdiction to amend or vacate its order after the notice of appeal has been filed . . . ." *Lewis v. Tobacco Workers' Int'l Union*, 577 F.2d 1135, 1139 (4th Cir. 1978). Or more generally, a district court loses jurisdiction when the court of appeals assumes jurisdiction. But writs of mandamus function differently from ordinary appeals, and we have no need at this time to extend *Lewis's* holding categorically to all issues challenged in mandamus petitions.

Indeed, there are good reasons not to do so. For example, many mandamus petitions seek to require district courts to rule on matters which, in the petitioner's view, have been subject to an unwarranted district court delay. See, *e.g.*, *In re Richardson*, 734 Fed. App'x 901 (4th Cir. 2018) (per curiam); *In re Gallardo*, 709 Fed. App'x 179 (4th Cir. 2018) (per curiam). A mandamus petition may prompt the district court to turn its attention to the case. Those situations are quite different from the one before us and

6

indicate why, in light of such disparate scenarios, a broad jurisdictional rule addressing district court actions during the pendency of a mandamus petition would be inappropriate.

None of this, however, forecloses our review of the district court's actions and its reassertion of jurisdiction in the circumstances of this case. The analogy to *Lewis* illustrates just how infirm was the district court's decision to rescind its initial gag order in favor of an option to request a new or modified gag order for the third nuisance trial. In *Lewis*, the court of appeals had merely received notices of appeal when the district court intervened. 577 F.2d at 1139. This case involved circumstances well beyond that. The court of appeals had already scheduled the case for expedited hearing, the parties had already written and filed appellate briefs, and the court was poised to hear the case within weeks. The district court should have allowed our responsibilities to run their due course rather than revisiting its order right before plenary appellate review. For the district court to take up an issue squarely before the court of appeals on the very eve of oral argument risks a duplication of resources through simultaneous consideration of the very same order by two courts, even as it invites confusing or conflicting dispositions of the issue.

The mischief of the trial court's action should be apparent. Allowing the August 31 rescission of the June 27 gag order to stand would invite district courts to track cases on the appellate court's docket, and when a reversal seemed possible or imminent, to pull the rug out from under the appellate court and the parties. This sets up an endless game of cat and mouse. One need only contemplate the inadvisability of a court of appeals

revisiting its opinions *sua sponte* on the eve of a Supreme Court argument to understand the inappropriateness of the course of action below.

The All Writs Act empowers this court to "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (2012). Mandamus, while appropriate only in rare circumstances, plainly extends to invalidating district court orders that threaten to undermine the very system of review that the All Writs Act protects. For those reasons, the district court's order of August 31 was in error. Since the August 31 order so plainly undercut the court of appeals in the orderly exercise of its own jurisdiction, it cannot be allowed to moot the petition.

### B.

Even if the district court had properly rescinded the gag order, this case still would not be moot. While several aspects of mootness doctrine might be relevant here, including voluntary cessation of erroneous conduct,* we need hold only that this case is capable of repetition yet evading review. "A dispute qualifies for that exception only if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *United States v. Sanchez-*

---

* We note that the Supreme Court recently applied the voluntary cessation doctrine when the Southern District of California altered its challenged pretrial restraint policy before the Supreme Court reviewed the case. *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 n.1 (2018).

*Gomez*, 138 S. Ct. 1532, 1540 (2018) (internal quotation marks omitted). This court and the Supreme Court have both applied this exception to vindicate First Amendment rights. See, *e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 546-47 (1976); *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 63 (4th Cir. 1989). We follow those examples here.

First, it is self-evident that the challenged order was undone too quickly for appellate review. Indeed, this court granted expedited review to address the serious First Amendment concerns raised by petitioner in a timely manner. Yet the district court attempted to rescind its order shortly before oral argument and only two months after issuing the order. See *Baltimore Sun*, 886 F.2d at 63 (less than "eight months" after mandamus filing was too short to be fully litigated). This sort of withdrawal risks a series of orders too short to be reviewed but too damaging to be ignored.

Second, petitioner must demonstrate a reasonable expectation that the district court will subject it to another gag order. In *Nebraska Press*, the Supreme Court held that a First Amendment violation was capable of repetition because the Nebraska Supreme Court could subsequently reverse the underlying conviction and order a new trial. 427 U.S. at 546. For petitioner here, future trials are more than a contingency as in *Nebraska Press*. They are a near certainty. Many hundreds of plaintiffs await their day in court, and petitioner will likely be defending against these nuisance suits for years to come. It is easy to see this scenario repeating itself. Plaintiffs may seek another gag order before a future trial (as the district court invited them to do prior to a future trial). Or the district court may issue another gag order *sua sponte*, only to vacate such an order on the eve of

appellate argument. This is the sort of case for which "capable of repetition yet evading review" is made.

The gag order has already inflicted serious harm on parties, advocates, and potential witnesses alike. It has muted political engagement on a contested issue of great public and private consequence. It has hamstrung the exercise of First Amendment rights. Even in short doses, these harms are hostile to the First Amendment. Indeed, as petitioner notes, the threat of a gag order will hang over these trials as a sort of "Sword of Damocles," dangling by the thread of the court's displeasure. Opposition to Respondents' Motion to Dismiss Petition as Moot at 10. Its chilling effect is evident and unacceptable; the mandamus petition is not moot.

Respondents' motion to dismiss the petition is accordingly denied.

### III.

We now turn to the merits. Petitioner challenges the gag order in the form of a writ of mandamus. We reiterate that "mandamus is a 'drastic' remedy that must be reserved for 'extraordinary situations.'" *Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016) (quoting *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 402 (1976)). Courts provide mandamus relief only when (1) petitioner "ha[s] no other adequate means to attain the relief [it] desires"; (2) petitioner has shown a "clear and indisputable" right to the requested relief; and (3) the court deems the writ "appropriate under the circumstances." *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380-81 (2004) (internal quotation marks omitted).

Respondents contend that petitioner should have sought reconsideration in the district court before petitioning for mandamus relief in this court. We disagree. A motion for reconsideration would not have been an "adequate" means of attaining relief from the gag order. The trial court had already considered the legal issues surrounding the gag order. Moreover, petitioner's "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); see *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury."). Parties need not endure repeated and irreparable abridgments of their First Amendment rights simply to afford the district court a second chance. And the public need not suffer the prolonged deprivation of robust discussion on an issue that affected so many in the community so tangibly.

Indeed, this court has recognized that mandamus plays an important and necessary role in protecting First Amendment freedoms. For example, we have long held "that mandamus is the preferred method of review for orders restricting press activity . . . ." *In re Wash. Post Co.*, 807 F.2d 383, 388 (4th Cir. 1986); see also *In re State-Record Co.*, 917 F.2d 124, 126-27 (4th Cir. 1990) (per curiam) (expressing preference for mandamus). Even when such orders are challenged via both direct appeal and mandamus, we have elected to provide mandamus relief. See *In re Charlotte Observer*, 882 F.2d 850, 852 (4th Cir. 1989). And we have even treated an "appeal as a petition for mandamus" when reviewing a sealed access order challenged on First Amendment grounds. *United States v. Appelbaum*, 707 F.3d 283, 289 (4th Cir. 2013). This court has reviewed gag orders in criminal cases via a mandamus petition. *In re Russell*, 726 F.2d 1007, 1008 (4th Cir.

11

1984); *In re Wall St. Journal*, 601 F. App'x 215, 218 (4th Cir. 2015) (per curiam) (reviewing sealing and gag order). While gag orders in civil cases are quite rare (there being no Sixth Amendment right at issue), the First Amendment interests in an open and public civil justice system are no less salient, and we see no reason to depart from longstanding mandamus procedure when reviewing the civil gag order in this case.

IV.

Given that a mandamus petition is the appropriate mechanism for challenging the gag order, *Cheney*, 542 U.S. at 380, we next ask whether petitioner has shown a "clear and indisputable" right to the requested relief. *Id.* at 381. As we explain below, petitioner has met its burden because the gag order contravened the First Amendment in basic respects.

Under the challenged gag order, the parties, their lawyers, and all potential witnesses were not allowed to "give or authorize any extrajudicial statement . . . relating to the trial, the parties or issues in this case" if such statement could reasonably reach "public communications media" and could "interfere with a fair trial or prejudice any plaintiff, the defendant, or the administration of justice." Gag Order at 3 (J.A. 617). The gag order designated as prejudicial any statement "intended to influence public opinion regarding the merits of this case." *Id.* Covered individuals could, however, discuss some basic information "without elaboration or any kind of characterization." *Id.*

Even among First Amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions. Like all "court orders that

12

actually forbid speech activities," *Alexander v. United States*, 509 U.S. 544, 550 (1993), gag orders are prior restraints. Prior restraints bear "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Prior restraints upend core First Amendment principles because "a free society prefers to punish the few who abuse rights of speech after they break the law [rather] than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

Similarly, gag orders are presumptively unconstitutional because they are content based. *Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (presumption against content-based restraints). Content-based restrictions target "particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Gag orders inherently target speech relating to pending litigation, a topic right at the core of public and community life. But the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted).

In light of these twin presumptions, gag orders must survive strict scrutiny. *Reed*, 135 S. Ct. at 2226 (strict scrutiny for content-based restrictions). We review orders limiting First Amendment rights *de novo*. *Charlotte Observer*, 882 F.2d at 852. And we require trial courts to support them with reasoning "specific enough to enable the reviewing court to determine" whether the order survives rigorous scrutiny. *Wash. Post Co.*, 807 F.2d at 391; see *State-Record Co.*, 917 F.2d at 129 ("[W]e have required

13

specific reasons and findings on the record, because without such findings, *de novo* review is difficult." (internal citation omitted)). Applying searching review, we hold that petitioner has demonstrated a "clear and indisputable" right to relief from the gag order because it breached basic First Amendment principles in both meaningful and material ways. *Cheney*, 542 U.S. at 381.

A.

Strict scrutiny first requires that a gag order serve a "compelling" public interest. See *Reed*, 135 S. Ct. at 2226. "Our system of justice properly requires that civil litigants be assured the right to a fair trial." *Hirschkop v. Snead*, 594 F.2d 356, 373 (4th Cir. 1979) (en banc) (per curiam). Ensuring fair trial rights is a compelling interest, however, only when there is a "reasonable likelihood" that a party would be denied a fair trial without the order under challenge. *Russell*, 726 F.2d at 1010.

While respondents here attempt to analogize the gag order's restrictions to the rules of professional ethics (and the arguably less demanding standards applied to them), see *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), this particular order extended far beyond the legal profession. The Supreme Court's decision in *Nebraska Press* thus guides our understanding of when a party would be denied a fair trial in the absence of a gag order under review. Specifically, a gag order may issue only if there is a likelihood that "publicity, unchecked, would so distort the views of potential jurors that [enough] could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 569 (1976).

14

The district court—without adequate factual findings or development of a record—found that a "significant increase in trial publicity" supported the gag order. Gag Order at 2 (J.A. 616). But the fact of publicity is hardly dispositive. Publicity often accompanies trials, including trials in which the public has a keen and understandable interest. The judicial process does not run and hide at those moments when public appraisal of its workings is most intense. An impartial jury, moreover, need not be wholly unaware of information—including potentially prejudicial information—outside the record. "Prominence does not necessarily produce prejudice, and juror *impartiality . . . does not require ignorance*." *Skilling v. United States*, 561 U.S. 358, 381 (2010).

Jurors are not that fragile. Under admonishment from the court, the jury must confine its consideration to what it saw and heard in the courtroom. Moreover, courts often tell jurors to disregard statements at trial that should not have been made or evidence that should not have been admitted. Courts also routinely instruct jurors to consider potentially prejudicial evidence, when admitted, only for a non-prejudicial purpose. To take but one example, Federal Rule of Evidence 404(b) permits evidence of a "crime, wrong, or other act" to show, *inter alia*, motive, opportunity, or intent. Trial courts instruct jurors not to consider such evidence as establishing a person's bad character. See, *e.g.*, *United States v. Faulls*, 821 F.3d 502, 508 (4th Cir. 2016) (affirming admission of evidence under Federal Rule of Evidence 404(b) as proof of motive after trial judge gave an instruction "reminding the jury that it should not consider the evidence to prove [defendant's] character or his propensity to commit the charged offenses").

The question, therefore, is neither whether a case has garnered public attention nor whether public discussion of it risks revealing potentially prejudicial information. Guidance is the critical concept. The question is whether the judge finds it likely that he or she will be unable to guide a jury to an impartial verdict. If judges can guide the jury to an impartial verdict, then no gag order may issue.

The record here demonstrates that the trial court assembled impartial juries each time it needed to do so. Plenty of potential jurors remained unfamiliar with the case, and most of those with prior exposure remained able to serve impartially. Two even did so. There was no showing here that the judge could not guide a jury to an impartial verdict.

Further and crucially, a gag order must actually "operate to prevent the threatened danger." *Neb. Press*, 427 U.S. at 562. Sometimes the inevitability of publicity surrounding civil proceedings will render a gag order entirely superfluous. On other occasions parties and counsel may even mitigate any prejudice by disseminating accurate and timely information to the public. By prohibiting only certain kinds of information from selected sources, a gag order can actually warp and distort discussion, thereby enhancing prejudice rather than mitigating it.

It is anything but clear that this gag order would accomplish its intended purpose of reducing risks to fair trial rights. See also *infra* Part V (discussing a variety of the gag order's unintended and costly effects). Amici identified a torrent of potentially prejudicial news coverage released after the gag order had taken effect. Brief Amici Curiae of the American Farm Bureau Federation and the North Carolina Farm Bureau Federation at 15-18, app. Recent news coverage included florid characterizations of farmers and hog

16

farms, discussions of excluded testimony from an odor expert, and attacks on the attorneys at trial. *Id.* (referencing various news articles). It is simply not clear why this gag order would not work selective and uneven impositions. Those could prove even less desirable than a fuller and more balanced airing of the viewpoints surrounding the hotly disputed question of the benefits and problems that hog farming has brought to eastern North Carolina.

For these reasons, the gag order did not further a compelling interest based on the record before us.

B.

Even when a gag order furthers a compelling interest, it must be the "least restrictive means" of furthering that interest, *Ashcroft*, 542 U.S. at 666. The law empowers trial courts to ensure fair jury trials using a number of tools short of gag orders. These tools include enlarged jury pools, *voir dire*, changes to a trial's location or schedule, cautionary jury instructions, and, in more unusual circumstances, sequestration. The gag order failed to explain if and why these alternatives had proven ineffective. See *Neb. Press*, 427 U.S. at 565 (holding that "the record [was] lacking in evidence to support" a finding that alternative "measures might not be adequate").

In particular, our system places abundant trust in *voir dire*, which is a process "within the province of the trial judge." *Ristaino v. Ross*, 424 U.S. 589, 595 (1976) (internal quotation marks omitted). Trial judges possess great discretion over the "depth or breadth of *voir dire*," *Skilling*, 561 U.S. at 386, and they routinely use that discretion to identify jurors unable to render a fair verdict. *Voir dire* is effective because of the general

17

desire of jurors to express themselves honestly, the desire of lawyers to winnow out partial jurors through questions (where permitted) and strikes, and the desire of trial courts in assessing credibility and bias to ensure a fair trial. For these reasons, *voir dire* "can serve in almost all cases as a reliable protection against juror bias however induced." *Charlotte Observer*, 882 F.2d at 856. That maxim holds true here. *Voir dire* has already thrice proven effective in assembling juries in the *McKiver*, *McGowan*, and *Artis* trials. The gag order should not have come before less restrictive alternatives including *voir dire* were somehow found or proven to be ineffective.

Strict scrutiny also demands that First Amendment restraints be "narrowly tailored" to serve their intended purpose. *Reed*, 135 S. Ct. at 2226 (2015). Each restriction must be no "greater than necessary." *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999). The overbreadth doctrine permits litigants to challenge First Amendment restrictions even so far as they also impinge others' First Amendment rights, see *Broadrick v. Oklahoma*, 413 U.S. 601, 611-13 (1973), and we thus consider whether this gag order was narrowly tailored as it applies to all covered parties.

The gag order was not narrowly tailored. It included no findings specific to the various individuals it restricted. It treated lawyers no differently from parties, who in turn were treated the same as potential witnesses. It assumed all covered individuals were identically situated vis-à-vis pending and future litigation. Moreover, the gag order applied blanket restrictions to more than twenty cases that will be tried over a period of years. Participants in any given trial appear to remain restricted until the resolution of the final case.

18

What is more, the unclear yet extraordinary reach of the phrase "potential witness" could include almost anyone who is knowledgeable or conversant about the issues in these cases. This breadth alone cannot help but impair legitimate news gathering activities that in and of themselves underlie the proper functioning of the First Amendment. See *Branzburg v. Hayes*, 408 U.S. 665, 681 (noting that news gathering qualifies for First Amendment protections because "without some protection for seeking out the news, freedom of the press could be eviscerated"). The gag order's blanket restrictions thus exceed what would be "essential to the preservation of a fair trial." *Hirschkop*, 594 F.2d at 364.

Gag orders should be a last resort, not a first impulse. The skimpy findings supporting the gag order here frustrate the sort of fulsome, substantive appellate review that shields First Amendment freedoms from unjustifiable restraints. The lack of narrow tailoring and the availability of less-restrictive alternatives are among the further defects that accompanied the imposition of the challenged order in this case.

C.

We turn finally to petitioner's vagueness challenge. In *Hirschkop* this court held, in the company of many others, that vague restrictions on speech "offend" the First Amendment. 594 F.2d at 371. For that reason, restraints on speech must include "some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1888 (2018). Speakers deserve to know. This core requirement of clarity avoids twin problems. For one, "[t]he interpretive process itself would create an inevitable, pervasive, and serious risk of chilling protected speech

19

pending the drawing of fine distinctions that, in the end, would themselves be questionable." *Citizens United v. FEC*, 558 U.S. 310, 327 (2010). Vague restraints also pose the risk of discriminatory or arbitrary enforcement. See *Gentile*, 501 U.S. at 1051.

This gag order was unconstitutionally vague because it forced individuals to "guess at its contours," *id.* at 1048. To take but one example, it permitted statements describing "the general nature of an allegation or defense," but only "without elaboration or any kind of characterization whatsoever." Gag Order at 3 (J.A. 617). The Supreme Court has expressly found nearly identical language permitting discussion of the "general nature" of a defense "without elaboration" to be vague. *Gentile*, 501 U.S. at 1048-49. This gag order's uses of "general" and "elaboration" were impermissibly vague, too. Since "'general' and 'elaboration' are both classic terms of degree," a person subject to the gag order has "no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated." *Gentile*, 501 U.S. at 1048-49. Moreover, the phrase "public communications media," Gag Order at 3 (J.A. 617), contains no hint of how it would apply to social media. When and how are social media posts "public communications media?" Does it turn on whether a post is public or private, on the account's number of followers, or on whether a reporter is among those followers? The gag order simply does not provide an answer.

The gag order also only vaguely specified who it covered. Individuals and organizations are led to guess whether they are "potential witnesses," a term the gag order does not even define. To illustrate, when a lawyer for the North Carolina Pork Council inquired whether her non-party client had to comply with the gag order, the

20

district court called the order "self-[explanatory]" and said that "[y]ou'll just have to try to figure it out or file a motion or something. I can't expand on what it covers." J.A. 620-21. To the contrary, the pool of potential witnesses was unimaginably large and anything but self-explanatory. If read to its full extent, the pool of possible witnesses included nearly everyone related to the controversy over pork farming in eastern North Carolina. A gag order must make clear to whom it applies; this gag order failed to do so.

## V.

For all the reasons highlighted above, the gag order fails First Amendment scrutiny to such a degree that petitioner possesses a "clear and indisputable" right to relief from the district court's decree. *Cheney*, 542 U.S. at 381. Like all First Amendment infringements, the gag order's harms are "per se irreparable" injuries. *Johnson*, 586 F.2d at 995. Mandamus relief is "appropriate under the circumstances," *Cheney*, 542 U.S. at 381, because orders such as this one carry severe consequences.

The gag order harmed petitioner. Petitioner has identified various attacks on its business practices and public policy involvement to which it could not respond while the gag order was in effect. Brief of Petitioner at 11-13. It also could not respond to a flood of news coverage following the second jury verdict. *Id.* The gag order assertedly forced petitioner into an untenable posture of silence, imposing real consequences above and beyond the particulars of the legal proceedings. See Brief Amici Curiae of the National Association of Manufacturers and North Carolina Chamber Legal Institute in Support of Petitioner at 17 (asserting that "62% of Americans take a business's 'no comment' about pending litigation to mean that the business is covering up wrongdoing" (citing Julia

21

Hood, *"No Comment" Won't Cut It, Finds Survey*, PR Week (Aug. 5, 2002))). Whether hyperbolic or not, petitioner's assertions drew plausibly on the language of the gag order itself.

Gag orders like this one may in fact conflict with securities disclosure requirements. The Securities and Exchange Commission requires corporations to disclose specific facts in both periodic and situational filings. To take but one example, corporations must disclose the magnitude of material litigation risks. *Id.* at 12-13. A company will often disclose risks with the disclaimer that it "believes that this claim lacks merit and intends to defend itself vigorously against it." *Id.* at 13 (quoting Christopher M. Holmes et al., *When to Set a Reserve: Now, Never, or Somewhere in Between* 12 (2004)). But such a disclosure may run afoul of this gag order's prohibition on discussing the case with "any elaboration or any kind of characterization whatsoever." Gag Order at 3 (J.A. 617).

The gag order harms farmers. North Carolina farmers claim they have been unable to participate in industry-wide conferences discussing the nuisance suits' potential effects on their livelihoods. Brief Amici Curiae of the American Farm Bureau Federation and North Carolina Farm Bureau Federation in Support of Petitioner at 5-8. They assert they are prohibited from commenting on what they perceive as the almost existential threat posed by large nuisance suit verdicts to an industry they claim provides some 46,000 jobs for North Carolina. *Id.* at 11-12 (citing Greg Barnes, *Suits Against Smithfield Could Leave Hog Industry in Doubt*, Fayetteville Observer (June 16, 2018)). These harms are allegedly exacerbated by the farmers' inability to engage with policymakers who are

22

considering legislative solutions at the federal, state, and local levels of government. See, *e.g.*, *id.* at 8-9. The gag order in their view is forcing them into a posture of passivity at a time when they have every right to be outspoken.

The gag order also harms nuisance suit plaintiffs. It prevents hundreds of plaintiffs from discussing fully how the pork industry, for all its benefits, threatens their very quality of life through alleged odors, noise pollution, waste management practices, and the accompanying declines in property values. See, *e.g.*, Third Amended *McGowan* Complaint at 1-3, 38 (J.A. 237-39, 274). Plaintiffs describe in one complaint how "[l]arge black flies periodically descend upon [their] properties, ruining and interfering with family activities, cookouts and other outdoor activities." *Id.* at 2. They also allege the nearby hog farms sometimes toss hog carcasses in "dead boxes," which are "dumpsters full of dead animals left out in the open often in plain view." *Id.* at 2-3. While legal filings are, of course, not covered by the gag order, they point to a larger case that plaintiffs and their supporters, many of whom may be involved in future legal proceedings, might wish to take to the public.

All these people care. This case is about their lives and their livelihoods. Whatever differences the parties and their supporters have, they possess in common a passionate First Amendment interest in debating their futures. It seems very wrong that a court would take that from them.

For all the reasons above enumerated, we direct the district court to vacate its June 27, 2018 gag order and August 31, 2018 order proposing unspecified tweaks and modifications to it. The parties are to start from square one with respect to this issue

under the guidance set forth in this opinion, and then only if exceptional circumstances warrant.

The petition is hereby granted.