**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-2281**

In re: EXPRESS SCRIPTS, INC.,

Petitioner.

On Petition for Writ of Mandamus. United States District Court for the Northern District of West Virginia at Wheeling. John Preston Bailey, District Judge. (5:24-cv-142-JPB)

Argued: March 19, 2026                                    Decided: May 15, 2026

Before NIEMEYER, RICHARDSON, and HEYTENS, Circuit Judges.

Petition granted in part by published opinion. Judge Richardson wrote the opinion, in which Judge Niemeyer and Judge Heytens join.

**ARGUED:** Christopher George Michel, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Petitioner. Anthony J. Majestro, POWELL & MAJESTRO, PLLC, Charleston, West Virginia, for Respondents. **ON BRIEF:** Charles R. Bailey, Justin C. Taylor, BAILEY & WYANT, PLLC, Charleston, West Virginia; William J. Ihlenfeld, Maximillian F. Nogay, FLANNERY GEORGALIS, LLC, Morgantown, West Virginia; Michael J. Lyle, Jonathan G. Cooper, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Petitioner. Christina L. Smith, POWELL & MAJESTRO, PLLC, Charleston, West Virginia; Paul T. Farrell, Jr., Michael J. Fuller, Jr., FARRELL & FULLER, LLC, San Juan, Puerto Rico; Robert P. Fitzsimmons, Clayton J. Fitzsimmons, Mark A. Colantonio, Christine Pill Fisher, FITZSIMMONS LAW FIRM, PLLC, Wheeling, West Virginia, for Respondents.

RICHARDSON, Circuit Judge:

The right to a jury trial was "the glory of the English law." 3 William Blackstone, *Commentaries* \*379 (1768). So the Founders enshrined it in the Seventh Amendment, ensuring that the right would be preserved in "Suits at common law." U.S. Const. amend. VII.

In this case, Plaintiffs—120 local governments in West Virginia—brought a public-nuisance claim against Express Scripts. They allege that Express Scripts contributed to the oversupply of opioids in their communities. For their remedy, they seek an "abatement fund" that would pay not only for the removal of this oversupply, but also for addiction treatment, education, and community rehabilitation. Express Scripts demanded a jury trial, which the district court denied. Express Scripts then petitioned this Court for a writ of mandamus to vindicate its right to a jury trial. We grant the writ.

The Seventh Amendment entitles litigants to a jury trial unless the claim would have been heard, and the remedy awarded, by courts of equity at the Founding. In public-nuisance cases, only courts of law could provide money damages to redress the downstream harms of a public nuisance. Part of the relief Plaintiffs seek—including funding to treat addicts and to educate the public about opioid risks—is a classic legal remedy. Plaintiffs' proposed remedy thus goes beyond what a court of equity could have provided in 1791. So Express Scripts is entitled to a jury trial.

I.      BACKGROUND

Plaintiffs—120 cities, towns, and counties across West Virginia—sued Express Scripts—a pharmacy benefit manager—alleging that it created a public nuisance. They

2

claim that Express Scripts interfered with public rights to health and safety by contributing to the oversupply of opioids in their jurisdictions.[1]  And they seek an injunction requiring Express Scripts to "fund the abatement of the ongoing public nuisance" and "compensate" Plaintiffs "for the costs of rectifying the nuisance."[2]  Second Am. Compl. ¶ 911, Dkt. No. 128 (first quote); Resp. to Pet. for Writ of Mandamus 19 (second quote).  Express Scripts demanded a jury trial on this claim.

Plaintiffs recently dismissed several other claims against Express Scripts, leaving only their public-nuisance claim.  But Plaintiffs have not filed a revised complaint, so it is somewhat difficult for us to determine what their abatement fund would include.  We thus rely on statements made by Plaintiffs' counsel at oral argument to discern what they claim

---

[1] Our Court recently held that "under West Virginia law, an unreasonable interference with a right common to the general public resulting from the distribution of opioids may qualify as a public nuisance when the evidence establishes that distribution of this product unreasonably 'operates to hurt or inconvenience an indefinite number of persons.'" *City of Huntington v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 563 (4th Cir. 2025) (quoting *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 921 (W. Va. 1997)).  Although this holding was only an *Erie* prediction as to "what the State Supreme Court would conclude based on that state's existing law," *id.* at 562, we are bound by that prediction until West Virginia's highest court speaks to the issue. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938); *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016); *see also City of Huntington v. AmerisourceBergen Drug Corp.*, 915 S.E.2d 828, 838 (W. Va. 2025) (declining to answer this as a certified question).

[2] *See* W. Va. Code § 61-9-3 (2026) ("Whenever a nuisance exists, the attorney general of the State, the prosecuting attorney of the county wherein the same exists, or any person who is a citizen, resident or taxpayer of the county, may bring suit in equity in the name of the State of West Virginia, upon the relation of such attorney general, prosecuting attorney, or any person, to abate such nuisance and to perpetually enjoin the person or persons maintaining the same from further maintenance thereof."); *Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d at 921; *Duff v. Morgantown Energy Assocs.*, 421 S.E.2d 253, 257 (1992).

would be among "the costs of rectifying the nuisance." There, Plaintiffs stated that the abatement fund "would be something like the abatement plan in *Huntington*,"[3] and would cover not only eliminating the oversupply of opioids, but also treatment for addiction, community rehabilitation, and education about the dangers of opioids.[4]

Despite Express Scripts' demand for a jury trial, the district court ordered a bifurcated bench trial on Plaintiffs' public-nuisance claim. Phase I was set to address: (1) whether Express Scripts caused the alleged oversupply and diversion of opioids throughout West Virginia; and (2) whether that oversupply and diversion constitute a public nuisance under West Virginia law. If Plaintiffs were to prevail at Phase I, the case would then proceed to a "statewide abatement trial" in Phase II, which would address "causation of opioid epidemic harms in Plaintiffs' communities that relate to the equitable remedy of abatement." Add. to Pet. for Writ of Mandamus ("Add.") 1–2.

Express Scripts moved for reconsideration and, in the alternative, certification of several issues for interlocutory appeal under 28 U.S.C. § 1292(b). First, Express Scripts

---

[3] *See* 157 F.4th at 573 ("The local governments request about $2.5 billion to implement measures related to (1) prevention of opioid addiction, (2) treatment of addiction, (3) recovery from addiction, and (4) special aid needed for certain vulnerable populations . . . . In particular, the local governments seek funds to develop inpatient and outpatient treatment facilities for individuals addicted to opioids and individuals at risk of becoming addicted to opioids. They also request funds to establish 'drug courts,' vocational training, and mental health counseling to 'enhance public safety' and to help those affected by addiction reintegrate into their communities. According to the proposed abatement plan, the local governments predict that these measures will be necessary for at least 15 years to abate opioid-related addiction, crime, death, and disease in the local governments' communities.").

[4] Oral Argument at 30:30–34:28, *In re Express Scripts, Inc.*, No. 25-2281 (4th Cir. March 19, 2026), ca4.uscourts.gov/OAarchive/mp3/25-2281-20260319.mp3.

4

claimed that a bench trial would infringe its Seventh Amendment right to a jury trial, because each of Plaintiffs' claims sought money damages. Second, Express Scripts argued that the proposed trial exceeded the district court's authority because Plaintiffs lack Article III standing and statutory authority to bring statewide representative claims on behalf of the public.

The district court denied Express Scripts' motions. First, it held that "the Seventh Amendment does not confer a right to a jury trial in this matter" because it was a "governmental public nuisance action seeking only abatement." Add. 10. The court characterized the sought-after relief as "equitable in nature and, therefore, outside the scope of the Seventh Amendment jury-trial guarantee." *Id*. Second, the district court denied Express Scripts' request to reconsider the statewide trial. It acknowledged that Plaintiffs "are not proceeding on behalf of the State as *parens patriae*" and thus are not "asserting a statewide cause of action." Add. 13. Still, the court rejected Express Scripts' arguments against statewide relief, reasoning that "[t]he trial plan does not purport to determine the rights of counties or municipalities that are not parties to this litigation," even though it "intend[ed] to hear evidence on a single, statewide abatement remedy." Add. 2, 13.

While Express Scripts' reconsideration motion was pending, the West Virginia Attorney General filed a materially identical action on behalf of the State. *See West Virginia ex rel. McCuskey v. Evernorth Health, Inc.*, No. 5:25-cv-00182-JPB (N.D.W. Va. Aug. 15, 2025), ECF No. 1. That action is pending before the same judge, so Express Scripts asked the district court to coordinate the two actions and stay this case pending resolution of the State's action. The district court refused.

Plaintiffs then sought to have the State's action consolidated with this case for purposes of discovery. The district court agreed. The State's action covers the same alleged conduct over the same period as this case, but also asserts claims of negligence, civil conspiracy, and civil RICO.

Express Scripts then filed this mandamus petition claiming (1) that the district court improperly denied its Seventh Amendment right to a jury trial on Plaintiffs' public-nuisance claim, and (2) that the district court exceeded its jurisdiction by ordering a "statewide" trial.

## II.    DISCUSSION

### A.    Standard For Issuing A Writ Of Mandamus

"Mandamus is a drastic remedy that must be reserved for extraordinary situations." *In re Murphy-Brown, LLC*, 907 F.3d 788, 795 (4th Cir. 2018) (cleaned up). This Court typically grants mandamus "only when (1) petitioner 'has no other adequate means to attain the relief it desires'; (2) petitioner has shown a 'clear and indisputable' right to the requested relief; and (3) the court deems the writ 'appropriate under the circumstances.'" *Id.* (cleaned up) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380–81 (2004)). Mandamus thus generally requires both a clear and indisputable right and the absence of an adequate remedy on appeal. *See In re Chicago, R.I. & P. Ry. Co.*, 255 U.S. 273, 275–76 (1921).

But the standard looks different when the petitioner challenges the denial of its Seventh Amendment right to a jury trial. "In this circuit, a petition for a writ of mandamus is the proper way to challenge the denial of a jury trial." *In re Lockheed Martin Corp.*, 503

6

F.3d 351, 353 (4th Cir. 2007); *see also Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472 (1962) (explaining that it is "the responsibility of the Federal Courts of Appeals to grant mandamus where necessary to protect the constitutional right to trial by jury"); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 511 (1959) ("[T]he right to grant mandamus to require jury trial where it has been improperly denied is settled."). Therefore, we can—and must—consider the merits of Express Scripts' jury-trial demand.

### B.      We Decline To Grant The Writ On The Statewide-Trial Order

The district court's order for a "statewide" abatement trial raises concerns. Although the district court disclaimed any intent to adjudicate the rights of non-party municipalities and counties, it nevertheless proposed to hear evidence on and fashion a single, statewide abatement remedy. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 851–56 (2025) (explaining that "'[c]omplete relief' is not synonymous with 'universal relief,'" and that it is "a narrower concept" that allows courts to "administer complete relief *between the parties*" (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928))). Despite this tension, we decline to issue the writ on this question. Should the district court ultimately enter relief that sweeps beyond what is necessary to provide Plaintiffs redress, Express Scripts may challenge that remedy on direct appeal. *See In re Chicago, R.I. & P. Ry. Co.*, 255 U.S. at 275–76. So Express Scripts has not met the high bar required for mandamus relief on this issue.

We thus turn to Express Scripts' jury-trial right under the Seventh Amendment.

7

## C.    The Seventh Amendment Entitles Express Scripts To A Jury Trial

The Seventh Amendment provides:  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."  U.S. Const. amend. VII.[5]  The Amendment preserves a right; it does not create one.  And we measure what was "preserved" against the rules that governed "Suits at common law" in 1791.  *Dimick v. Schiedt*, 293 U.S. 474, 476 (1935).  That historical anchor ties the Amendment to its original public meaning.  *See Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–47 (1830) (Story, J.).

The Amendment's "Suits at common law" tracks the traditional Anglo-American distinction between common law courts (with jury trials) and equity courts (without jury trials).  *Cf.* U.S. Const. art. III, § 2, cl. 1 (extending the "judicial Power" to "all Cases, in Law and Equity").  But the Seventh Amendment's distinction is not limited to the specific writs or forms of action that existed in common law courts.  Rather, a suit "at common law" includes any suit whose nature involves enforcing legal rights (such as rights to property) and providing legal remedies (such as compensatory damages).  This stands in contrast to suits in equity, which involved purely equitable rights (such as those arising from the law of trusts) and equitable remedies (such as specific performance or injunctions) traditionally administered by a chancellor without a jury.  *Parsons*, 28 U.S. at 446 ("The

---

[5] The Seventh Amendment was added to the Bill of Rights because Anti-Federalists, deeply distrustful of a powerful federal judiciary staffed by politically insulated judges, feared that judges would otherwise wield excessive power.  *See* Edith Guild Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289, 292–96 (1966); *United States v. ERR, LLC*, 35 F.4th 405, 409–10 (5th Cir. 2022).

phrase 'common law' . . . is used in contradistinction to equity, and admiralty, and maritime jurisprudence."). When civil litigants bring a suit that would have been at common law in 1791—*i.e.*, when the claim seeks a legal remedy to vindicate a legal right—both parties have the same right to a jury trial they would have had in 1791.

The Seventh Amendment effectively sets a jury trial as the default in civil cases. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 537 (1958) (recognizing a "federal policy favoring jury decisions"). That's because the Seventh Amendment right embraces "all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." *Parsons*, 28 U.S. at 447. To deny the jury right, it is not enough to show that the suit *would not* have been heard at law. Instead, denying the right requires showing that the suit *would* have been heard in equity (or admiralty).

To determine whether a suit triggers the Seventh Amendment's guarantee, we conduct two historical inquiries. First, we compare the action at issue to analogous eighteenth-century actions "brought in the courts of England prior to the merger of the courts of law and equity." *Tull v. United States*, 481 U.S. 412, 417 (1987); *Curtis v. Loether*, 415 U.S. 189, 193 (1974). Second, and more importantly, we examine the remedy sought and ask whether it is the kind of remedy that would have been granted by courts of law or courts of equity in eighteenth-century England.[6] *Tull*, 481 U.S. at 417–18, 421; *see*

---

[6] For criticism of this two-pronged test, *see* Samuel L. Bray, *Equity, Law, and the Seventh Amendment*, 100 Tex. L. Rev. 467, 484–97 (2022). Professor Bray argues that it is ahistorical to evaluate separately whether the "claim" and the "remedy" are legal or equitable in nature. This is because generally equity's jurisdiction was never freestanding.

*also Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348–55 (1998); *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 565 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41–42 (1989); *Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 657–58 (4th Cir. 2023).

The Supreme Court has called the remedy inquiry "more important" than the historical-analog inquiry but has never explained what this difference means in practice. *See, e.g.*, *Terry*, 494 U.S. at 565; *Tull*, 481 U.S. at 421; *Curtis*, 415 U.S. at 196. Despite this fogginess, the Court's recent decision in *Jarkesy* suggests that a remedy's legal nature can be virtually determinative in entitling the defendant to a jury trial. *SEC v. Jarkesy*, 603 U.S. 109 (2024). There, the Court first explained that the civil penalties the SEC sought were "a type of remedy at common law that could only be enforced in courts of law." *Id.* at 125. That historical fact "effectively decide[d] that [the] suit implicate[d] the Seventh Amendment right, and that a defendant would be entitled to a jury." *Id.* The Court thus concluded that "the remedy [was] all but dispositive," *id.* at 123, before turning to the historical-analog question to "confirm[] that conclusion." *Id.* at 125. What's more, *Jarkesy*

---

Rather, it was supplementary to law courts' jurisdiction, operating as second-order "meta-law." *See generally* Henry E. Smith, *Equity as Meta-Law*, 130 Yale L.J. 1050 (2021). Thus, when courts today try to evaluate an equitable "claim" separately from an equitable "remedy," they are often asking a question without any clear historical answer—at least insofar as that claim originated in equity's concurrent jurisdiction. This difficulty perhaps explains the Supreme Court's repeated statements that the remedial inquiry is "more important." *See Jarkesy*, 603 U.S. at 123 ("Since some causes of action sound in both law and equity, we concluded that the remedy was the 'more important' consideration." (citing *Tull*, 481 U.S. at 421)).

10

shows the prongs need not be taken in order.  So, because it drives our conclusion, we first analyze the second prong.

### 1.      Law and equity courts provided distinct remedies in 1791

To determine whether the relief Plaintiffs seek is legal or equitable in nature, we must ascertain what equity could—and could not—do in 1791 when confronted with a public nuisance.  Public nuisance has always operated in two distinct forms.  As Professor Goldberg explains, it can be at once an offense against the public—vindicated by abatement at equity and/or by criminal prosecution at law—and a tort against a victim who suffers special injury from the nuisance—vindicated by an action for compensatory damages at law.  *See* John C.P. Goldberg, *On Being a Nuisance*, 99 N.Y.U. L. Rev. 864, 940–41 (2024) ("For the offense [of public nuisance] to be committed, there must be the requisite interference with a right common to the public.  For the tort to be committed, there must additionally be a distinct interference with the plaintiff's actual ability to access, use, or enjoy some resource or space . . . ." (emphasis omitted)).[7]  Each form carried with it its own remedy, and the remedy determined the forum in which to redress the wrong of

---

[7] *See also* J.R. Spencer, *Public Nuisance: A Critical Examination*, 48 Camb. L.J. 55, 56 (1989) (describing public nuisance as a "chameleon"); Thomas W. Merrill, *Is Public Nuisance a Tort?*, 4 J. Tort L. 1, 6–19 (2011) (tracing the historical distinction between public nuisance as a criminal offense against the sovereign and as a basis for a private tort action by a specially injured plaintiff); Anthony J. Sebok, *Making Sense of Abatement as a Tort Remedy*, 73 DePaul L. Rev. 525, 539–40 (2024); Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 782 (2003) ("There is no historical evidence . . . that the state (or its predecessor under English law, the Crown) was ever able to sue for damages to the general public resulting from a public nuisance. The state's remedies were restricted to prosecution or abatement, or both.  Damages were reserved only for those individuals suffering special injuries.").

public nuisance. Abatement of the offending condition itself was sought in equity, while damages for the special harm that the condition caused were sought at law.

This basic distinction between public-nuisance-as-offense and public-nuisance-as-tort originates in a hypothetical posed by Sir Anthony Fitzherbert in an anonymous 1535 Year Book decision. *See* Y.B. 27 Hen. 8, f. 26, Mich., pl. 10 (1535) (Eng.). Fitzherbert imagines a defendant who digs a trench across a public highway, obstructing the way and consequently injuring a horse and its rider. The obstruction is itself the public nuisance—an *injuria* to a public right—redressable as a public wrong (then primarily by criminal prosecution), even if no one had yet suffered any actual harm.[8] The injured rider, however, would have a private cause of action at law to recover damages for the peculiar harm he suffered on account of the public nuisance.

Fitzherbert's hypothetical sketches the contours of a division of labor between law and equity that developed over the following centuries and was firmly established by the late eighteenth century. The public remedy was abatement—the elimination of the nuisance-constituting condition by, for example, requiring the defendant to fill in the

---

[8] Suits at common law to vindicate private rights required both *injuria* (a legal wrong) and *damnum* (actual, concrete harm). Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 719 n.146 (2004) (marshalling "considerable historical support" for this proposition); *see, e.g.*, *Lynn Corp. v. London Corp.*, 100 Eng. Rep. 933, 939 (K.B. 1791); *see also* 3 William Blackstone, *Commentaries* *219–20. In contrast, suits to vindicate public rights—*e.g.*, actions brought in equity to abate a public nuisance, or at law to prosecute one—required only *injuria*; there was no need to await a concrete *damnum* suffered by any particular individual. *See, e.g.*, *Wesson v. Washburn Iron Co.*, 13 Allen 95, 102 (Mass. 1866); H.G. Wood, *A Practical Treatise on the Law of Nuisances in Their Various Forms* 22 (1875); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345–46 (2016) (Thomas, J., concurring).

trench.  The private remedy was damages, which would include compensation for the rider's broken leg and lamed steed.[9]  Equity's remedial powers reached the condition that interfered with the public right but no further.  It could order the trench filled, but it could not pay the rider's surgeon.  Any downstream consequences that may have flowed from the trench—the rider's broken leg, the injured horse, or a merchant's lost business—were not equity's concern.  Those consequences gave rise to damages, and damages were awarded by the law courts alone.

Understanding why the remedy in this case could not have been awarded in equity requires understanding the scope of the abatement remedy as administered by courts of equity in 1791.  Founding-era practice demonstrates that equity courts did one thing—and only one thing—with public nuisances:  They stopped them.  Equitable abatement aimed solely at eliminating the nuisance itself, not at providing compensation to victims for losses suffered on account of the nuisance.  Founding-era cases and leading treatises speak with one voice on this point.

Take Lord Hardwicke, who articulated the principle that governed equity's treatment of both public and private nuisances:  Chancery "will not interfere in many instances in which an action for damages might be maintained," because the "interposition of a Court of Equity in such instances is on the principle of preventing material injury

---

[9] *See* Restatement (Second) of Torts § 821C (A.L.I. 1979) (explaining that because a public entity proceeding in public nuisance seeks to vindicate a common right, it pursues either criminal penalties or civil actions to abate the nuisance at the defendant's expense; whereas a private public-nuisance plaintiff—because they are not suing to vindicate a public right—sues to seek compensation for harms suffered as a result of the public nuisance, apart from the interference with the public right).

13

amounting to a nuisance; and is by no means ancillary to the mere recovery of damages." *Ryder v. Bentham*, Ves. Sen. Supp. 242, 242 (1750) (emphasis omitted).[10] Equity's role was to prevent the future continuation or initiation of a nuisance by way of injunction; law's domain was the compensation of harm already suffered by way of an award of damages.

Cases that dealt explicitly with public nuisance bear this idea out. In *Attorney General v. Parmeter*, the Attorney General filed an information in the Court of Exchequer to abate the erection of a wharf and other structures in Portsmouth harbor, claiming that these structures constituted a public nuisance. 1 Dow 316, 316–18 (H.L. 1813).[11] The House of Lords affirmed the decree ordering the structures' removal and enjoining future encroachments of the same kind. *Id.* at 319–20, 323. Notably, the decree ran exclusively to the offending condition itself—the removal of the nuisance-constituting structures—and did not seek to remediate any harm that the structures may have visited upon merchants, mariners, or the surrounding community. Once the court ordered the offending condition removed, equity's work was done.

Two decades before *Parmeter*, the Court of Exchequer had articulated the same principle. In *Attorney General v. Richards*, the defendants had erected a wharf, docks, and other buildings between the high- and low-water marks of Portsmouth harbor, obstructing

---

[10] *Ryder* was a case involving an alleged *private* nuisance. But its principle also governed the way that equity dealt with public nuisances.

[11] The cited decisions and treatises postdating 1791 reflect a settled tradition that the late-eighteenth-century practice embodied.

14

navigation and impairing the harbor's functioning.  2 Anst. 603, 603 (Ex. 1795).  The information prayed "that the defendants might be restrained from making any further erections, that those made might be abated, and the harbour *restored*."  *Id.* (emphasis added).  The court held that "[w]here a nuisance and purpresture in a harbour are committed, an information in equity lies to abate it," *id.*, and decreed the encroachments abated, *id.* at 615–16.  Just as in *Parmeter*, the decree reached only the offending condition.  There was no award of damages to the merchants whose shipping had been obstructed, nor any compensation for the costs incurred by others in working around the encroachment.  Equity's jurisdiction stopped at abatement.[12]

In *Attorney General v. Johnson*, a defendant who had begun constructing a wharf on the Thames continued construction even after the initiation of a criminal nuisance prosecution.  2 Wils. Ch. 87, 87, 37 Eng. Rep. 240 (Ch. 1819).  To avoid a *fait accompli*, Lord Eldon—who served as Lord High Chancellor between 1801 and 1806, and again between 1807 and 1827—granted a preliminary injunction restraining further construction pending trial.  The relief was once again directed at stopping the obstruction.  Equity's reach stopped there; it did not extend to compensating merchants for lost trade, defraying

---

[12] Eden's treatise collects earlier authorities tracing this jurisdiction to a 1587 decision restraining the erection of a pigeon-house as a common nuisance.  *See* Robert Henley Eden, *A Treatise on the Law of Injunctions* 224–25 (1821) (discussing *Eliz. Bond's Case*, Mo. 238 (1587)); *see also Richards*, 2 Anst. at 606–08 (canvassing the earlier authorities cited by Lord Hale in *A Treatise Relative to the Maritime Law of England* (1787) (published posthumously but likely written c. 1670), all of which purportedly awarded abatement, and none of which appear to have awarded damages); *Corning v. Lowerre*, 6 Johns. Ch. 439, 439 (N.Y. Ch. 1822).

increased shipping costs, or redressing any other downstream consequence of the defendant's encroachment. Countless cases bear out these same principles.[13]

Two leading treatises from this period confirm these principles. Writing in 1836 and drawing on this same line of decisions, Justice Story observed that while "an information . . . lies in equity to redress the grievance [of a public nuisance] by way of injunction," the instances of equity's interposition were "principally confined to informations seeking preventive relief." 2 Joseph Story, *Commentaries on Equity Jurisprudence* § 923 (1836). The "ground of this jurisdiction," he explained, was equity's "ability to give a more complete and perfect remedy than is attainable at law, *in order to prevent irreparable mischief*," *id.* § 924 (emphasis added)—not its capacity to compensate for harm already done. Eden's treatise, published fifteen years earlier, had said the same: Equity's jurisdiction in cases of public nuisance "is founded on the right to restrain the exercise or the erection of that, from which irreparable damage to individuals, or great public injury, would ensue." Robert Henley Eden, *A Treatise on the Law of Injunctions* 220 (1821). And Pomeroy, writing later, summarized the rule: "A court of equity has jurisdiction to restrain existing or threatened public nuisances by injunction," a jurisdiction everywhere confined to the restraint or abatement of the nuisance itself. John Norton Pomeroy, *Equity Jurisprudence* § 1349 (4th ed. 1919); *see also* John Norton Pomeroy,

---

[13] *See, e.g.*, *Baines v. Barker*, Amb. 158, 27 Eng. Rep. 105 (Ch. 1752) (Hardwicke, C.); *Attorney General v. Cleaver*, 18 Ves. Jun. 212 (Ch. 1811) (Eldon, C.); *Crowder v. Tinkler*, 19 Ves. Jun. 617 (Ch. 1816) (Eldon, C.); *Attorney General v. Burridge*, 10 Price 350, 350 (Ex. 1822); *Attorney General v. Forbes*, 2 My. & Cr. 123 (Ch. 1836) (Cottenham, C.).

16

*Equitable Remedies* § 479 (3d ed. 1905).   Therefore, what emerges from the cases and treatises is a clear and consistent rule:   Equity's domain was the elimination of the offending condition itself, and nothing more.

Equity's inability to award compensation did not leave specially injured victims without a remedy for a public nuisance's downstream harms.   Law courts *did* have jurisdiction to provide precisely that remedy:   damages for the harmful after-effects of a public nuisance, available to any plaintiff who could demonstrate particular harm or loss beyond that suffered by the public at large.

In *Rose v. Miles*, for example, the King's Bench held that a plaintiff whose loaded vessels were obstructed mid-transit by the defendant's unlawful blocking of a navigable creek had suffered a special injury sufficient to sustain a private action for compensatory damages.   4 M. & S. 101, 103–04, 105 Eng. Rep. 773 (K.B. 1815).   The law courts—not Chancery—awarded compensatory damages under the special-injury rule in case after case.[14]   So damages were a separate remedy, awarded in a separate court.   The point is that

---

[14] *See, e.g.*, *Hart v. Basset*, 84 Eng. Rep. 1194, 1195 (K.B. 1681) (holding that plaintiff suffered special injury beyond the general public harm where defendant's obstruction of a public way compelled him to use a more arduous route to reach his barn); *Iveson v. Moore*, 91 Eng. Rep. 1224, 1230 (K.B. 1699) (holding that being compelled to incur greater expense in transporting coal, owing to defendant's unlawful obstruction of a public road, constituted special injury sufficient to sustain a private damages action); *Greasly v. Codling*, 130 Eng. Rep. 307, 308 (C.P. 1824) (similar); *Wilkes v. Hungerford Mkt. Co.*, 132 Eng. Rep. 110, 115–18 (C.P. 1835) (holding that a bookseller whose customers were diverted by defendant's unlawful obstruction of a public way suffered special injury beyond the general public harm, entitling him to compensatory damages for his business losses); *Commonwealth v. Webb*, 27 Va. 726, 729 (Gen. Ct. 1828); *Smith v. City of Boston*, 61 Mass. 254, 255 (1851).

the public-nuisance action *at equity* existed only to provide "preventive" relief via the abatement of a nuisance's continuation.

Vice-Chancellor Shadwell articulated this principle clearly in the 1836 case of *Spencer v. London & Birmingham Railway Co.*, 8 Sim. 193, 59 Eng. Rep. 77 (1836). There, a coach-master whose business had been ruined by the defendant's cutting off a public street filed a bill in Chancery, seeking both injunctive relief and "an account . . . of all loss and damages sustained by the Plaintiff[] . . . by reason of the cutting through and stopping up of the horse and carriage road," along with a decree that the defendant "pay to the Plaintiff[] the amount which should be found due to [him]." *Id.* at 196–97. Vice-Chancellor Shadwell ruled that the damages component was off-limits in Chancery. Recognizing that the plaintiff had suffered "a species of injury quite distinct from that done to His Majesty's subjects in general," the Vice-Chancellor observed: "It is plain that [the plaintiff] might have recovered for the injury he suffered if he had brought an action [at law]. I do not mean to say that he may, therefore, recover in equity." *Id.* at 198–99. The injunctive component of the bill was granted; the part that requested damages was rejected. For those damages, though available at law, had no place in equity. *See also Sampson v. Smith*, 8 Sim. 272, 276–77, 59 Eng. Rep. 108 (1838) (Shadwell, V.C.).

### 2. The abatement fund Plaintiffs seek would not have been awarded by a court of equity in 1791

Thus far, we have seen that law and equity courts provided starkly different remedies at the Founding. Courts of equity could provide injunctive relief designed to abate the public nuisance itself, while law courts provided damages to specially injured

18

plaintiffs for the nuisance's downstream harms.  This framework resolves this case.  The relief that Plaintiffs seek is not limited to the sort of abatement recognized by equity in 1791.  Rather, the proposed "abatement" fund includes the legal remedy of compensation for the downstream consequences of the alleged nuisance.

We are bound by our holding in *Huntington* that, "under West Virginia law, the remedy of abatement may be applied both to compel the cessation of wrongful conduct *and* to provide for the remediation of harmful conditions caused by that conduct."  157 F.4th at 574.  So this Court predicted that West Virginia's modern abatement remedy could require a defendant to "pay money to fund efforts to eliminate the resulting harm to the public." *Id.*  And the Court made clear that an "abatement fund" can include money to provide treatment and rehabilitation for opioid addicts.  *See* 157 F.4th at 573–74.  But at the Founding, that sort of relief would have been quintessentially legal.

Plaintiffs' description of their proposed relief shows that they seek the full measure of the remedy permitted by *Huntington*—not simply the elimination of the alleged oversupply of opioids, but also compensation for its downstream consequences.[15]

---

[15] The Supreme Court's decision in *Dairy Queen, Inc. v. Wood* makes clear that "the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings."  369 U.S. 469, 477–78 (1962).  We therefore cannot simply look at the label "abatement" and categorically assign that remedy a legal or equitable character.  Rather, we must examine the actual substance of the relief that Plaintiffs seek and determine whether such relief is of the sort that would have been available in the courts of equity in 1791.  *See also id.* at 480 (Harlan, J., concurring) (explaining that the mere fact that an "accounting" is sought "is not of itself dispositive of the jury trial issue," and that the court must instead determine whether the substantive claim is "one cognizable only in equity").  Our decision may look different if Plaintiffs had disclaimed any of the legal remedies that *Huntington* held to be part of West Virginia's modern abatement remedy.

19

Plaintiffs' counsel stated at oral argument that the abatement fund "would be something like the abatement plan in *Huntington*."[16] Oral Argument at 30:30–34:28. Asked to detail the abatement that his clients seek, counsel stated that it would "eliminate the resulting harm" of Express Scripts' alleged oversupply of opioids by providing "treatment" and "rehabilitation" for addicts. *Id.*

Although such funds may be recoverable under modern West Virginia public-nuisance law, in 1791 no court of equity would have had the power to grant them. The fact that *Huntington* characterized such relief as "equitable" for purposes of contemporary West Virginia public-nuisance law, *id.* at 575, does not matter here. *Cf. Simler v. Conner*, 372 U.S. 221, 222 (1963) ("In diversity cases, of course, the substantive dimension of the claim asserted finds its source in state law, but the characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by

---

But we have no occasion to address that issue here, where Plaintiffs have modeled their request on the abatement fund in *Huntington*.

[16] In *Huntington*, the proposed abatement fund included "$2.5 billion to implement measures related to (1) prevention of opioid addiction, (2) treatment of addiction, (3) recovery from addiction, and (4) special aid needed for certain vulnerable populations." 157 F.4th at 573. This Court went on:

> [T]he local governments seek funds to develop inpatient and outpatient treatment facilities for individuals addicted to opioids and individuals at risk of becoming addicted to opioids. They also request funds to establish 'drug courts,' vocational training, and mental health counseling to 'enhance public safety' and to help those affected by addiction reintegrate into their communities. . . . [T]he local governments predict that these measures will be necessary for at least 15 years to abate opioid-related addiction, crime, death, and disease.

*Id.* at 573.

recourse to federal law." (internal citation omitted)). *Huntington* did not purport to decide whether West Virginia's abatement remedy would have been awarded by courts of equity in 1791. But that *is* the question before us. And to answer that question, we do not ask what label state or federal courts affix to a remedy today, but whether the relief sought is the kind that English courts of equity would have awarded at the Founding. By that measure, the relief awarded in *Huntington*—and sought by Plaintiffs here—is legal, not equitable. The fund would target not merely the oversupply of opioids (the alleged public nuisance) but the treatment of people who have suffered on account of that oversupply. Such treatment would constitute compensation for the downstream harm that the nuisance caused—textbook legal damages. Indeed, under Plaintiffs' theory of the public-nuisance claim, opioid addicts—the beneficiaries of the sought-after treatment programs—may well fit into the "specially injured" camp. But that only highlights that the remedy sought here includes legal relief.

When asked to explain why their proposed relief would not include damages for the harm caused by the oversupply—as opposed to relief aimed at eliminating the oversupply itself—counsel invoked West Virginia's definition of public nuisance as "an act or condition" that interferes with a public right, *see Huntington*, 157 F.4th at 567, and attempted to bring the existence of opioid addicts within the meaning of "condition" by drawing an analogy to pollution remediation: "[I]t's no different from the pollution case. We're not just telling them to stop the pollution; we're making them clean up the mess." But that analogy fails. In a pollution case, "cleaning up the mess" means removing the pollutant—the very condition that constitutes the nuisance. It does not extend to

21

compensating for the long-term and perhaps latent downstream harms that the mess has caused, *e.g.*, diseases arising from the consumption of polluted water. Here, Plaintiffs do not seek merely to remove the pollutant (the oversupply of opioids); instead, they seek to remedy the downstream effects of the pollutant through treatment, education, and community rehabilitation. That is not abatement of Express Scripts' conduct or of the condition that conduct allegedly created, namely, the oversupply of opioids.[17] Rather, it is compensation for the downstream harms that the oversupply allegedly caused, *i.e.*, legal damages.

Plaintiffs also argue that their remedy is not damages because it is forward-looking. But that's wrong. That a remedy looks forward does not necessarily make it equitable. Compensatory damages routinely include prospective components. A plaintiff who breaks a leg in a car crash recovers not only for past medical expenses but also for the future cost of occupational therapy needed to regain the ability to walk—relief that is prospective but undeniably legal. *See* Restatement (Second) of Torts § 924(c) (A.L.I. 1979) (providing that tort damages encompass both past and reasonably anticipated future medical expenses); *see also Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 416 (4th Cir. 2025) (explaining that "monetary relief to pay for the future cost of medical monitoring" is a form of "damages"). The same is true of funds to provide addiction treatment and

---

[17] As the district court explained, the trial would seek to answer whether "the alleged oversupply and diversion of opioids throughout West Virginia is a public nuisance." Add. 2. Thus, addiction caused by Express Scripts' alleged oversupply and diversion of opioids is a downstream effect of the nuisance, not the nuisance itself. A historical abatement remedy would therefore be confined to ending the oversupply of drugs, not treating addiction.

22

rehabilitation services to those allegedly harmed by the oversupply of opioids. The expenditure may lie in the future, but it compensates for harm suffered on account of the defendant's *past* conduct. Such compensation, whether for past or future harms, was the province of the law courts, not the equity courts. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (explaining that money damages seeking to compensate the plaintiff "for loss resulting from the defendant's breach of legal duty" are legal in nature).[18]

To recap: At the Founding, compensation for the downstream consequences of a public nuisance was available only in a court of law, not a court of equity. Part of the relief Plaintiffs seek here is precisely that—it is aimed not merely at eliminating the oversupply of opioids that Express Scripts allegedly created but also at compensating for the harms that have resulted from that oversupply. No court of equity in 1791 would have awarded such a remedy. This conclusion is "all but dispositive" in entitling Express Scripts to a

---

[18] To be clear: The mere fact that a plaintiff requests the payment of money does not, without more, render the relief they seek legal. *See, e.g.*, *Ellet Bros. v. U.S. Fidelity & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001); *United States v. Apex Oil Co.*, 579 F.3d 734, 736 (7th Cir. 2009); *In re Peabody Energy Corp.*, 958 F.3d 717, 724 (8th Cir. 2020); *United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982). Rather, whether the relief sought is legal or equitable turns on what that money would actually *do*: eliminate the nuisance, or compensate specially injured victims for the downstream consequences of that nuisance. *Cf. Jarkesy*, 603 U.S. at 122–23 (explaining that "whether a monetary remedy is legal" turns on what it is "designed" to do). To constitute equitable abatement, the money paid must be measured not by the plaintiff's losses (compensation), but by the reasonable cost of eliminating the nuisance itself. *See* Goldberg, *On Being a Nuisance*, 99 N.Y.U. L. Rev. at 912 n.193 ("[A]n unduly capacious notion of abatement would efface the distinction between enforcement actions responding to public nuisances themselves and tort actions predicated on special injuries resulting from a public nuisance.").

jury trial. *See Jarkesy*, 603 U.S. at 123. Indeed, given the nature of the public-nuisance claim discussed below, the second prong *is* dispositive.

### 3. The historical-analog inquiry is inconclusive and does not alter the result

We have so far ignored the first prong of the inquiry—whether claims analogous to Plaintiffs' would have been heard at law or in equity in eighteenth-century England. That is because, in the public-nuisance context, that inquiry is unhelpful. Unlike a claim for negligence (which was exclusively within the jurisdiction of the law courts), or breach of trust (which was part of equity's exclusive jurisdiction), *see Terry*, 494 U.S. at 567, a "claim for public nuisance" was a "chameleon." *See* Spencer, *Public Nuisance*, 48 Camb. L.J. at 56. Whether public nuisance was cognizable at law or in equity depended not on the nature of the underlying claim, but on what remedy a plaintiff sought. As we have seen, a public-nuisance action brought to abate a continuing interference with public rights sounded in equity; the same action brought by a specially injured plaintiff to recover compensation for the harm that the interference caused sounded in law. The claim could live in either court depending on the remedy sought.

That point is confirmed, not undermined, by *Tull*'s observation that "[a] public nuisance action was a classic example of the kind of suit that relied on the injunctive relief provided by courts in equity," and that "courts in equity refused to enforce [monetary] penalties" in such actions. 481 U.S. at 423–24. Far from suggesting that all flavors of public-nuisance actions belonged exclusively in equity, *Tull* underscores the very distinction on which this case turns: When a public-nuisance action was brought in equity,

equity provided only injunctive relief—the abatement of the nuisance-constituting condition—and nothing more. Monetary relief for the downstream consequences was beyond equity's reach—just as civil penalties were.

Thus, the second prong of the Seventh Amendment inquiry does all the work here. The question is not whether public-nuisance claims generally would have been heard at law or in equity in 1791—they would have been heard in *both*, depending on the remedy sought. Rather, the question is whether the specific relief Plaintiffs seek in this case would have been awarded by a court of law or a court of equity. And compensation for the downstream consequences of a public nuisance was unheard of at equity. Plaintiffs' cause of action, whatever label West Virginia may affix to it, would have been heard at law in 1791. Express Scripts is therefore entitled to a jury trial.[19]

\*       \*       \*

The Seventh Amendment's guarantee turns on a historical inquiry into whether the relief sought would have been awarded by courts of equity in 1791. Founding-era Chancery cases confirm that equitable abatement of a public nuisance was limited to eliminating the nuisance-constituting condition itself and did not extend to compensating for its downstream consequences. Compensation for such consequences was the exclusive province of the law courts. Plaintiffs' abatement fund seeks compensation—in the form of addiction treatment, rehabilitation, and education—for the downstream consequences of

---

[19] Because we conclude that Express Scripts is entitled to a jury trial, we do not reach the issue of whether to exercise mandamus as to the order in which Plaintiffs' and the Attorney General's cases must be tried.

25

the oversupply of opioids. It does not seek merely to end the oversupply. While that may

be allowed under West Virginia law, it wouldn't have been allowed in a court of equity at

the Founding. The remedy is therefore legal, and the Seventh Amendment guarantees a

jury trial.

*THE PETITION IS GRANTED IN PART.*